## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RODNEY TYGER and SHAWN
WADSWORTH, on behalf of
themselves and those similarly situated,

      Plaintiffs.

v.

PRECISION DRILLING CORP., *et al.*,

      Defendant.

No. 4:11-CV-01913

(Judge Brann)

## MEMORANDUM OPINION

### APRIL 11, 2018

Plaintiffs Rodney Tyger and Shawn Wadsworth, on behalf of themselves and those similarly situated, and Defendants Precision Drilling Corp., Precision Drilling Oilfield Services, Inc., and Precision Drilling Company, LP have filed cross-motions for partial summary judgment. For the reasons discussed below, Defendants' Motion is granted in part and denied in part, and Plaintiff's Motion is denied.[1]

---

[1] Defendants have also moved to strike Plaintiffs Statement of Undisputed Material Facts as having run afoul of M.D.Pa. Local R. 56.1. ("A motion for summary judgment filed pursuant to Fed.R.Civ.P.56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."). Having reviewed both Plaintiffs' submission and Defendants' **eighty-one (81) page** response, I will deny this motion. The density and scope of this filing is owed to Plaintiff's theory of this case as developed from relevant case law. While at times inclusive of immaterial facts, Plaintiffs' inclusion and citation to the record nevertheless aided the Court in addressing their arguments.

# I.    INTRODUCTION

This case has long history before the Court.   Named Plaintiffs Rodney Tyger and Shaun Wadsworth ("Plaintiffs"), on behalf of themselves and those similarly situated, filed this Fair Labor Standards Act ("FLSA") collective action complaint on October 17, 2011.[2]  Plaintiffs filed an amended complaint on January 4, 2012,[3] and Defendants Precision Drilling Corp., Precision Drilling Oilfield Services, Inc., and Precision Drilling Company, LP ("Defendants") answered on February 7, 2012.[4]  Defendants thereafter moved for summary judgment on all claims on February 29, 2012,[5] and Plaintiffs moved to conditionally certify a collective action on February 24, 2012.[6]  The Honorable Christopher C. Conner of this Court, to whom the matter was originally assigned, denied Defendants' motion for summary judgment on December 18, 2012 "without prejudice to defendant's right to refile such a motion at the close of discovery."[7]  On January 7, 2013, Chief Judge Conner conditionally certified a class of "all Precision hourly rig employees who worked for Precision in the United States within the last three years" based on

---

[2]    ECF No. 1.

[3]    ECF No. 8.

[4]    ECF No. 18.

[5]    ECF No. 28.

[6]    ECF No. 23.

[7]    ECF No. 48.

the three FLSA claims identified in the Amended Complaint.[8] Approximately

1,000 hourly, non-managerial employees have since joined this suit.[9]

On January 17, 2013, this matter was reassigned to me. Following an

extensive discovery period, including expert discovery, the parties both moved for

summary judgment. Defendants filed a motion for partial summary judgment on

April 10, 2017.[10] In this motion, Defendants argue that no genuine issue of

material fact exists and they are therefore entitled to summary judgment because:

(1) the time Plaintiffs spent donning and doffing personal protective equipment

was not compensable; and (2) the Plaintiffs' post-donning and pre-doffing walking

time was not compensable.[11] This matter has been fully briefed and is now ripe for

disposition.[12]

Plaintiffs cross moved for summary judgment on April 14, 2017.[13] In this

Motion, Plaintiffs request that the Court find, as a matter of law, that "(1)

Plaintiffs' donning, doffing, and inspecting personal protective equipment ("PPE")

was integral and indispensable to their jobs and therefore constituted "work" as a

---

[8]   ECF No. 49.

[9]   Pls.' Statement of Undisputed Material Facts ("Pls.' SUMF") (ECF No. 249) ¶ 2; Defs.'
      Response to Pls.' Statement of Undisputed Material Facts ("Defs.' Resp.") (ECF No. 263) ¶
      2.

[10]  ECF No. 239.

[11]  *Id.*

[12]  ECF Nos. 241, 257, & 271.

[13]  ECF No. 245.

matter of law; (2) Walking and waiting time following the donning and prior to the doffing is compensable as a matter of law – as well as unpaid meeting / shift-change time beyond the paid shift; [and] (3) Time spent in required safety and changeover meetings constituted "work" as a matter of law."[14]  This matter has been fully briefed and is ripe for disposition.[15]

## II.    FACTUAL BACKGROUND[16]

Defendants Precision Drilling Corp., Precision Drilling Oilfield Services, Inc., and Precision Drilling Company, LP ("Defendants") operate oil and gas drilling rigs under contract with oil and gas producers, known as "operators."[17]  On drilling rigs operated by Defendants, rig hand staffing includes the positions of floorhand (leasehand), motorhand, derrickhand, driller, and rig manager (collectively "rig hands").[18]  Each of Defendants' rigs are staffed by two of these crews, with each crew scheduled for a twelve hour shift followed by either a quarter hour or half hour pre-tour safety meeting.[19]  Rig hands work for multiple

---

[14]  *Id.*

[15]  ECF Nos. 248, 262, & 272.

[16]  The relevant facts are taken from the factual record in its entirety, to the extent undisputed. Any facts that remain in dispute are noted as such.

[17]  Defs.' Statement of Undisputed Material Facts ("Defs.'s SUMF")(ECF No. 240) ¶ 1; Pl.'s Answer to Defs.' Statement of Undisputed Material Facts ("Pl.'s Answer") (ECF No. 258) ¶ 1.

[18]  Defs.'s SUMF ¶ 2; Pls.' Answer ¶ 2.

[19]  Defs.'s SUMF ¶¶ 4-5; Pls.' Answer ¶¶ 4-5.

weeks in a row at more than twelve hours a day. They therefore work significantly more than 40 hours per week.[20]

Rig hands who work more than forty hours in a week are compensated at one and a half times their regular hourly rate.[21] As additional compensation, hourly rig hands receive a flat amount of money for each day spent working with oil based mud or synthetic based mud.[22] This reimbursement is primarily for the additional cost of more frequent boot replacements.[23] The crux of this dispute rests on whether (1) shifts are actually completed within that time frame, (2) pre-shift meetings were compensated before mid-2010, (3) employees performed work before and after those shift times, and (4) employees' shifts accurately and regularly pay for all time worked.[24]

The daily routine of a rig hand on Defendants' well sites is as follows. On some rigs, the crew's scheduled work time commences with a joint meeting with the outgoing crew in the "dog house," or an elevated centralized building located on the rig.[25] Prior to that meeting, the incoming crew dons their basic PPE.[26] On

---

[20]  Defs.'s SUMF ¶ 6; Pls.' Answer ¶ 6.

[21]  Defs.'s SUMF ¶ 7; Pls.' Answer ¶ 7.

[22]  Pls.' Answer ¶ 7.

[23]  Defs.' Responses to Pl.'s First Request for Admissions, Second Set of Production Requests, and Third Set of Interrogatories.

[24]  Pls.' Answer ¶ 5.

[25]  Pls.' SUMF ¶ 21 n.3.

other rigs, the incoming crew's shift begins with a pre-tour safety meeting in the

company man's trailer, rig manager's trailer, or the safety trailer.[27]  The routine for

outgoing crews similarly varies depending on whether this changeover meeting is

held.  If a changeover meeting is held, the outgoing crew goes to the dog house

prior to 6:00 a.m./p.m., and leaves after the meeting has concluded.[28]  If a

changeover meeting with both crews is not held, then the outgoing crew members

are relieved individually by the incoming crew members.[29]  Attendance at these

pre-tour meetings, regardless of the form taken, is mandatory.[30]

     The basic PPE for rig hands includes steel toed boots, a hard hat, safety

glasses, fire retardant coveralls ("FRC"), gloves, and ear plugs.[31]  The PPE is

required by both Defendants' policy[32] and the Occupational Health and Safety

---

[26]   Defs.'s SUMF ¶ 15; Pls.' Answer ¶ 15. Plaintiffs dispute that compensable work commences at this changeover meeting, arguing that donning the at-issue PPE constitutes the beginning of compensable time. *See* Pls.' Answer ¶ 15.

[27]   Defs.'s SUMF ¶ 16; Pls.' Answer ¶ 16. Plaintiffs dispute that they were not required to don the PPE at issue prior to this paid pre-tour safety meeting given both OSHA regulations and a confluence of Precision safety rules. *See* Pls.' Answer ¶ 16.

[28]   Decl. of Mike Skuce (ECF No. 242-1) ¶ 15; Decl. of James Christiansen (ECF No. 242-3) ¶¶ 7-8.

[29]   Decl. of Patrick Breaux (ECF No. 242-2) ¶ 5.

[30]   Pls.' SUMF ¶ 18; Defs.' Resp. ¶ 18.

[31]   Defs.'s SUMF ¶ 14; Pls.' Answer ¶ 14.

[32]   *See* Precision Training Manual (requiring that "[y]ou must be wearing all of your protective equipment once you get past the vehicles toward the rig because work activities may be occurring there.").

Administration.[33]  It is worn to avoid common hazards of the worksite, including

(1) Chemicals, (2) Electrical Shock, (3) Flying debris, (4) Gases – pressurized and

nonpressurized, (5) Dropped objects, (6) Overhead equipment, (7) Rotating

equipment, (8) Slippery surfaces, (9) Suspended loads, and (10) Working at

heights.[34]

One particular risk to the travails of rig hands are "tripping pipe" operations

performed by a derrickhand.[35]  During these operations, drilling pipe, weighing

approximately 500 pounds and drill collars ranging from 2,700 pounds to 5,000

pounds, is lifted by elevator and secured before ultimately being lowered into the

bore hole for drilling.[36]  During this operation, the derrickhand works in an

elevated monkeyboard and is harnessed with a 60' fall protection rope.[37]  In this

position, he maneuvers these large pipes into position.[38]  The additional PPE used

in this operation, including the fall protection rope, is not at issue in this suit.[39]

---

[33]  29 C.F.R. § 1910.132.

[34]  Pls.' SUMF ¶ 24; Defs.' Resp. ¶ 24.

[35]  Pls.' SUMF ¶ 30; Defs.' Resp. ¶ 30.

[36]  Pls.' SUMF ¶ 30-31; Defs.' Resp. ¶ 30-31.

[37]  Pls.' SUMF ¶ 31; Defs.' Resp. ¶ 31.

[38]  *Id.*

[39]   Defs.' Resp. ¶ 31.

Defendants' drilling rigs also use a variety of different types of drilling mud, including water-based mud, oil-based mud, and gel-based mud.[40] Gel-based mud includes caustic.[41] Oil-based mud, on the other hand, commonly contains diesel fuel.[42] Water-based mud does not contain diesel fuel or other petroleum based products.[43] Defendants have explained the risk of chemicals used in drilling muds, including "caustic," as follows:

> Precision admits that its drilling operations at times involve the use of caustic and synthetic based mud, and the mixing of caustic and of additives in mud. **Precision further admits that caustic is a common name for sodium hydroxide, used mainly to control pH in water based mud, and is a strong alkali that will cause severe burns to eyes, skin and respiratory tract**. If an employee is exposed to caustic or its mixing in mud without proper PPE, such as rubber aprons and gloves, possibly use of a respirator, and safety glasses, then exposure can be harmful to an employee's health. Precision admits that exposure to synthetic based mud can be harmful to an employee's health and that harm to an employee's health is likely if, in the mixing process for synthetic based mud, the correct PPE, such as rubber aprons and gloves, and safety glasses, is worn. Precision admits that hundreds of different additives to mud may be used and exposure to the mixing of some of them can be harmful to an employee's health, but denies that harm is likely if proper PPE, like rubber aprons and gloves, in some cases respirators, and safety glasses, is worn.[44]

---

[40] Defs.'s SUMF ¶ 27; Pls.' Answer ¶ 27.

[41] Pls.' Answer ¶ 27. Over time, "gel and barite" exposure can cause "silicosis or other respiratory problems." *Id.*

[42] Defs.'s SUMF ¶ 30; Pls.' Answer ¶ 30.

[43] Defs.'s SUMF ¶ 35; Pls.' Answer ¶ 35.

[44] Pls.' SUMF ¶ 41; Defs.' Resp. ¶ 41 (emphasis added).

Plaintiffs' expert, Ronald E. Bishop, Ph.D., himself states that drilling fluids used on Defendants' rigs contain glycol ethers, such as 2-butoxyethanol, which can disrupt red blood cells and potentially cause endocrine disruption.[45]  Defendants, in turn, dispute the commonality of this finding concerning drilling fluids and, in the alternative, advance the conclusion of John M. DeSesso, Ph.D that 2-butoxyethanol exposure "does not cause injury to the testes or ovaries, does not cause teratogenicity, and is not a reproductive toxicant at reasonably anticipated human exposures."[46]

During any given shift, rig hands get their dirt, mud, drilling mud, grease, lubricants, and other substances on their PPE.[47]  While the extent to which PPE gets soiled depends on what rig operations are occurring and the position held by the employee,[48] Defendants do not dispute that the instant PPE reduces the risk of exposure to chemicals and drilling fluid.[49]  This reduction of risk is further bolstered by the testimony of numerous rig managers who conceded that these coveralls often become covered by drilling fluids and caustic chemicals,[50] and  the

---

[45]  Pls.' SUMF ¶ 52.

[46]  Defs.' Resp. ¶ 52 (citing Expert Report of John M. DeSesso (ECF No. 264-1), at 8).

[47]  Defs.'s SUMF ¶ 2; Pls.' Answer ¶ 2.

[48]  Pls.' SUMF ¶ 38; Defs.' Resp. ¶ 38.

[49]  Pls.' SUMF ¶¶ 61-62;  Defs. Resp. ¶¶ 61-62.

[50]  See Dep. of Shayne Klepper (Rig Manager) (ECF No. 242-9) at 48:5-49:2; Dep. of James Joyce (Rig Manager) (ECF No. 242-16) at 25:14-28:20; Dep. of Cody Neufeld (Rig Manager) (ECF No. 10) at 106:22-108:22.

testimony of Dr. Bishop that the instant, generic PPE has the added benefit of limiting exposure to "everything that's on the outside" including this oil-based mud.[51]

If a Precision rig hand gets significant amounts of oil-based mud on his coveralls during a shift, he is required to clean his PPE and change his coveralls as soon as possible and on the clock.[52] There is evidence that rig hands were often not able to stop in the middle of tasks to change out of soaked PPE.[53] However, when performing work that, by its very nature, exposes them to high amounts of drilling fluid, Defendants supplied disposable Tyvek suits or waterproof rain suits that can be used by rig hands.[54] They also supplied face shields, respirators, aprons, and long gloves.[55]

Defendants' rigs on which Plaintiffs have worked all have company provided locker rooms or changing areas for donning and doffing this PPE.[56] Plaintiffs contest, however, Defendants' statements that the changing facilities were provided for convenience only and that Plaintiffs retained an option to don

---

[51]  Dep. of Ronald Bishop at 121:4-124:22.

[52]  Defs.'s SUMF ¶ 38; Pls.' Answer ¶ 38.

[53]  Pls.' Answer ¶ 37.

[54]  Defs.'s SUMF ¶ 38; Pls.' Answer ¶ 38.

[55]  Defs.'s SUMF ¶ 40; Pls.' Answer ¶ 40.

[56]  Defs.'s SUMF ¶ 13; Pls.' Answer ¶ 13.

and doff off-premises.[57]   In support thereof, Plaintiffs specifically cite a confluence

of Precision rules and supporting depositions which they aver remove that choice.[58]

They cite, for example, the testimony of Defendants' own Michael Adkins, Global

Vice President of Health and Safety at Precision who opined concerning the safety

of bringing soiled equipment beyond the changing facilities.[59]   He stated:

> Q.   Is it common sense that if you get drilling mud that has caustic chemicals on you, that you don't bring it home?
>
> A.   I'm sorry?
>
> Q.   Is it common sense, if you get drilling fluid on you that contains caustic, you wouldn't want to bring it home and wash it in your laundry machine where you do your kid's laundry? Would you agree with me that's common sense?
>
> A.   That is common sense but –
>
> Q.   Would you agree with me – I'm -- would you agree with me that it's common sense that if you get drilling fluid on you and the drilling fluid contains lime, you would not want to bring it home into your house where you have a family?
>
> A.   If an employee wants to do that, they can.
>
> Q.   And then No. 8 [in the Employee Handbook] says, "In a drilling operation, personal protective equipment is the most widely used protection from exposure to hazardous chemicals. PPE reduces your risk of exposure but does not eliminate the hazards. It is important to select the right protective device for a specific situation and use the device properly." Did I read that correctly?

---

[57]   Pls.' Answer ¶ 13.

[58]   *Id.*

[59]   Pls.' Answer ¶ 17.

A.    Yes.

Q.    So if a "health hazard," as defined in Paragraph 6, gets on standard PPE, is the employee still permitted to bring PPE home?

A.    Yes.

Q.    Is it safe for the employee to do that?

      MR. CROW: Objection, form. Foundation.

A.    There is nothing -- there is no regulation that states they cannot. …

Q.    Do you know if it's safe without -- do you know if it's safe, sitting here today?

A.    I don't know if it's unsafe. I can't answer. You are asking me "safe." It's either way: Safe or unsafe.

Q.    But the question is -- let me just ask it -- do you know if it's safe for an employee to bring home PPE that has a health hazard on it?

A.    I do not know.[60]

Plaintiffs further cite the testimony of Dr. Ronald Bishop, who stated that:

PPE items primarily protect these workers' eyes and skin from exposures to hazardous materials. However, once exposed to hazardous materials, PPE items themselves become hazardous, primarily via individuals' skin contact with hazardous materials, including potentially endocrine-disrupting glycol ethers and through inhalation of radioactive dust particles and related gases what emanate from contaminated PPE surfaces. Therefore, **it is my opinion that it would be unsafe for Precision Drilling employees to bring unclean PPE into enclosed areas (such as personal vehicles) or to bring unclean PPE outside the**

---

[60]    *Id.*

**worksite where it is likely to spread contamination and health hazards**.[61]

## III.   LAW

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[62]   A dispute is "genuine if a reasonable trier-of-fact could find in favor of the non-movant," and "material if it could affect the outcome of the case."[63]   To defeat a motion for summary judgment, then, the nonmoving party must point to evidence in the record that would allow a jury to rule in that party's favor.[64]   When deciding whether to grant summary judgment, a court should draw all reasonable inferences in favor of the non-moving party.[65]   Finally, when presented with cross-motions for summary judgment, such as here, a district court should consider the motions separately and apply the appropriate burden of production to each motion.[66]   Specifically, the United States Court of Appeals for the Third Circuit has clarified that:

---

[61]   *Id.* (emphasis added).

[62]   Federal Rule of Civil Procedure 56(a).

[63]   *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 300 (3rd Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 252 (1986)).

[64]   Federal Rule of Civil Procedure 56(c)(1); *Liberty Lobby*, 477 U.S. at 249.

[65]   *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

[66]   *See Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008).

Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.[67]

## IV.   ANALYSIS

### A.   Defendants' Motion for Partial Summary Judgment

Defendants argue that they are entitled to summary judgment on three premises in this FLSA collective action.  First, they argue that the undisputed facts demonstrate that Plaintiffs are not entitled to compensation for donning and doffing of personal protective gear ("PPE").  Second, Defendants argue that, pursuant to the failure of their claim for donning and doffing compensation, Plaintiffs are not entitled to compensation for walking time between the donning and doffing and the pre and post-shift safety meeting locations.  Finally, Defendants move for summary judgment on the claim that the failure to pay this above compensation was a willful violation of the FLSA.  I will address each of these arguments below.

### (1)   Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Compensation Claim for Time Spent Donning and Doffing the Instant Personal Protective Equipment

---

[67] *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008) (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)).

The Fair Labor Standards Act ("FLSA") was enacted in 1938 to protect covered workers from substandard wages and oppressive working hours.[68] To accomplish this goal, "[t]he FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract."[69] Among these guarantees is a section stipulating that covered employers may not employ any employee "for a workweek longer than forty hours unless such employee receives compensation for his employment . . . at a rate not less than one and one-half times the regular rate at which he is employed."[70] An employer who violates this section may be held liable for backpay, liquidated damages, and attorney's fees.[71]

The FLSA does not define the terms "work" or "workweek."[72] In this absence, the Supreme Court in *Anderson v. Mt. Clemens Pottery Co*."defined 'the statutory workweek' to 'include, all time during which an employee is required to be on the employer's premises, on duty or at a prescribed workplace,' " including "time necessarily spent by employees walking from timeclocks near the factory entrance gate to their workstations."[73] This holding was short-lived. In 1946,

---

[68]  *Barrentine v. Arkansas-Best Freight System*, 450 U.S 728, 739 (1981); 29 U.S.C. § 202(a).

[69]  *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 69 (2013).

[70]  29 U.S.C. § 207(a)(1).

[71]  *Integrity Staffing Solutions, Inc. v. Busk*, 135 S.Ct. 513, 516 (2014).

[72]  *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005).

[73]  *Id. at* 25–26 (quoting *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 690–91 (1946)).

Congress passed the Portal–to–Portal Act to shield employers from the resulting

unexpected liability resulting from portal-to-portal claims.[74]  The Portal–to–Portal

Act created two exceptions to FLSA-mandated compensation:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

> (2) activities which are preliminary to or postliminary to said principal activity or activities.[75]

This Act therefore created exceptions for "travel to and from the location of the

employee's 'principal activity,' and for activities that are preliminary or

postliminary to that principal activity."[76]  It did not otherwise change the Court's

earlier descriptions of "work," "workweek", or "workday."[77]

"Principal activity or activities" excluded from the ambit of the Portal–to–

Portal Act have been defined by the Supreme Court to include "all activities which

are an 'integral and indispensable part of the principal activities.' "[78]  Most recently

addressed in *Integrity Staffing Solutions, Inc. v. Busk*, the Supreme Court has

---

[74]  *De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 367 (3d Cir. 2007).

[75]  29 U.S.C. § 254(a).

[76]  *IBP, Inc. v. Alvarez*, 546 U.S. 21, 28 (2005).

[77]  *Id.*

[78]  *Integrity Staffing Solutions, Inc. v. Busk*, 135 S.Ct. 513, 517 (2014).

defined these words in their ordinary sense.[79]  To that end, the Supreme Court

wrote that:

> The word "integral" means "[b]elonging to or making up an integral whole; constituent, component; *spec*[*ifically* ] necessary to the completeness or integrity of the whole; forming an intrinsic portion or element, as distinguished from an adjunct or appendage." (citations omitted). And, when used to describe a duty, "indispensable" means a duty "[t]hat cannot be dispensed with, remitted, set aside, disregarded, or neglected." (citations omitted).

In the conjunctive, "an activity is therefore integral and indispensable to the

principal activities that an employee is employed to perform "if it is an intrinsic

element of those activities and one with which the employee cannot dispense if he

is to perform his principal activities."[80]

    In its motion for partial summary judgment and accompanying briefing,

Defendants argue that, because donning and doffing the personal protective

equipment ("PPE") cited is not a principal activity which Plaintiffs are hired to

perform, the inquiry properly before this Court is whether donning and doffing this

equipment is "integral and indispensable" to their primary activity—drilling oil

and gas wells.[81]  Defendants aver that these preliminary and postliminary activities

---

[79]  *Id.*

[80]  *Id.*; *see also* 29 CFR § 790.8(b) (2013) ("The term 'principal activities' includes all activities which are an integral part of a principal activity"); § 790.8(c) ("Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance").

[81]  Defs.' Br. in Supp. of Mot. for Partial Summ. J. (ECF No. 241), at 10.

fail this test because they are not an intrinsic element of drilling a well.[82] In

support of this conclusion, Defendants specifically state that a well can be drilled

without workers donning this basic PPE.[83] Furthermore, the present working

environment is not analogous or comparable to potentially lethal working

environments[84] which other courts have concluded rendered protective gear

"integral and indispensable."[85] Rather, Defendants advance that the instant gear,

imposed pursuant to OSHA's general industry regulations, is generic and cannot as

a matter of law meet the applicable legal threshold.[86]

Plaintiffs, in opposition here and in their separately addressed motion for

partial summary judgment, argue for a contrary result.[87] Specifically, Plaintiffs

contend that donning and doffing of the relevant PPE is mandated both by

regulations governing the industry and Defendants' own safety policies.[88]

Furthermore, responding to Defendants' argument concerning the possibility of

performing the principal activities of the drilling sans the PPE, Plaintiffs attempt to

---

[82] *Id.* at 11.

[83] *Id.* at 12.

[84] To the extent that the present working conditions evidence a lethal environment, Defendants argue that additional protective gear (including a respirator, face mask, rubber apron, and rubber gloves) is donned by employees on the clock. *See* Defs.' Br. in Supp. of Mot. for Partial Summ. J. (ECF No. 241), at 16.

[85] Defs.' Br. in Supp. of Mot. for Partial Summ. J. (ECF No. 241), at 15-16.

[86] *Id.*

[87] Pl.'s Memorandum of Law in Opp. To Defs.' Mot. for Partial Summ. J. (ECF No. 257).

[88] *Id.* at 4.

demonstrate the folly of this argument by discussing the daily dangers faced by rig workers.[89] Most pertinently, Plaintiffs cite the expert opinion of Ronald E. Bishop, Ph.D. to demonstrate the chemical exposure to which rig workers are exposed on a daily basis and the hazardous health effects of this exposure.[90] In essence and in direct response to Defendants, Plaintiffs argue that this working environment approaches the lethal level addressed in *Steiner v. Mitchell*,[91] and that holding the instant PPE to be generic and thus not integral and indispensable would be in contravention of both *Busk* and applicable circuit precedent.[92]

Given the citation to both *Steiner* and the different interpretations which the parties have assigned to this case in light of *Busk*, discussion and exploration of these cases in greater detail is warranted. In *Steiner v. Mitchell*, the plaintiffs were battery plant workers who, by nature of their work, were customarily exposed to various chemicals and accompanying fumes.[93] These chemicals included "lead metal, lead oxide, lead sulphate, lead peroxide, and sulphuric acid."[94] The risk from exposure to these chemicals was "very great" because the lead fumes and dust within the plant would "attach themselves to the skin, clothing and hair of the

---

[89] *Id.* at 5-6.

[90] Id. at 6.

[91] *Steiner v. Mitchell*, 350 U.S. 247 (1956).

[92] Pl.'s Memorandum of Law in Opp. To Defs.' Mot. for Partial Summ. J. (ECF No. 257), at 5-20.

[93] *Steiner*, 350 U.S. at 249.

[94] *Id.*

employees."[95]  Furthermore, the use of sulphuric acid within the plant exacerbated the susceptibility of these employees to contamination.[96]

The Supreme Court held in *Steiner* that the time battery plant employees spent showering and changing clothes post-shift was compensable, given this toxic exposure, because "it would be difficult to conjure up an instance where changing clothes and showering are more clearly an integral and indispensable part of the principal activity of employment."[97]  This holding was recently noted with approval in both *IBP, Inc. v. Alvarez*,[98] and *Integrity Staffing Solutions, Inc. v. Busk*.[99]  Indeed, in *Busk*, a unanimous decision of the Supreme Court, Justice Sotomayor wrote a concurring opinion to emphasize that both DOL regulations and precedent make clear that "an activity is 'indispensable' to another, principal activity only when an employee could not dispense with it without impairing his ability to perform the principal activity safely and effectively."[100]  Citing cases in which the Court had found "integral and indispensable activity" and contrasting them to the circumstance before the Court, Justice Sotomayor emphasized that:

> Thus, although a battery plant worker might, for example, perform his principal activities without donning proper protective gear, he could

---

[95]  *Id.*

[96]  *Id.*

[97]  *Id.* at 256.

[98]  546 U.S. 21 (2005).

[99]  135 S.Ct. 513 (2014).

[100]  *Id.* at 520 (Sotomayor, J., concurring).

not do so safely, (citation omitted); likewise, a butcher might be able to cut meat without having sharpened his knives, but he could not do so effectively. (citation omitted).[101]

The question presented therefore is whether the undisputed facts concerning the dangers inherent in the principal activity of oil and drilling render the instant personal protective equipment "integral and indispensable." The scope of this analysis necessarily displaces many of the arguments advanced by the parties. First, Plaintiffs, in their brief in opposition, rightly point out the weakness of Defendants' argument that the PPE was not "integral and indispensable" because it was theoretically possible to perform their principal tasks *sans* any gear.[102] In support of this argument, Defendants cite both the deposition testimony of Plaintiff workers who admitted that a well can be drilled without the basic PPE,[103] and evidence that such equipment had not been required in the past.[104] In accordance

---

[101] *Id.*

[102] Pl.'s Memorandum of Law in Opp. To Defs.' Mot. for Partial Summ. J. (ECF No. 257), at 3-6.

[103] *Id.* at 12 (citing Dep. of Glenn Hoganson (ECF No. 242-20) at 9-15, 20-23; Dep. of Jacob Lee Horst (ECF No. 242-21) at 55:18-56:1; Dep. of John Beaver (ECF No. 242-22) at 44:22-46:9; Dep. of Weston Mallin (ECF No. 242-23) at 99:4-100:5; Dep. of Rickey Koopman (ECF No. 242-24) at 14:20-16:6; Dep. of Jeremy E. Outman (ECF No. 242-25) at 62:2-63:9; Dep. of Travis Brasseaux (ECF No. 242-30) at 62:15-63:13; Dep. of Michael Volkman (ECF No. 242-31) at 89:21-90:11, 118:20-119:6; Dep. of Mark Hayward (ECF No. 242-33) at 87:23-88:2; Dep. of Jeremy Mitchell (ECF No. 242-34) at 46:24-47:11).

[104] *Id.* (citing Dep. of Shayne Klepper (ECF No. 242-9) at 68:5-15; Dep. of Cody Neufeld (ECF No. 242-10) at 78:22-79:7; Dep. of Glenn Hoganson (ECF No. 20) at 9-15, 20-23; Dep. of Michael Volkman (ECF No. 242-31) at 89:21-90:11, 118:20-119:6).

with the above examination of *Steiner* and *Busk*, this superficial argument misses the mark.

Rather, the pertinent inquiry remains whether the PPE was rendered "integral and indispensable" because, in its absence, Plaintiffs could not drill a well safely or effectively. In support of this *Steiner* argument, Plaintiffs argue first that, because federal law required the use of the instant PPE (steel toed boots, coveralls, safety glasses, and a hard hat), it was, as a matter of law, "integral and indispensable" to their safe completion of workday tasks.[105] Indeed, the Occupational Safety and Health Administration ("OSHA") at 29 C.F.R. § 1910.132 relates that:

> Protective equipment, including personal protective equipment for eyes, face, head, and extremities, protective clothing, respiratory devices, and protective shields and barriers, shall be provided, used, and maintained in a sanitary and reliable condition wherever it is necessary by reason of hazards of processes or environment, chemical hazards, radiological hazards, or mechanical irritants encountered in a manner capable of causing injury or impairment in the function of any part of the body through absorption, inhalation or physical contact.

This regulation, however, and any accompanying policy of Defendants requiring the donning of the instant PPE,[106] does not alter the instant analysis. Instead, like the above argument of Defendants concerning the ability of Plaintiffs to perform their tasks without the instant PPE, this argument fails.

---

[105] Pl.'s Memorandum of Law in Opp. To Defs.' Mot. for Partial Summ. J. (ECF No. 257), at 4.

[106] *See* HSE Field Reference Manual at 8-9.

As correctly pointed out by Defendants, the Supreme Court in *Busk* expressly rejected the argument that, because an employer *required* a particular activity, that activity was in itself "integral and indispensable."[107]  Indeed, the Supreme Court presciently wrote that "[i]f the test could be satisfied merely by the fact that an employer required an activity, it would sweep into "principal activities" the very activities that the Portal–to–Portal Act was designed to address."[108] Furthermore, while the presence of an OSHA regulation requiring the instant PPE is relevant to the instant analysis under *Busk*, it is not wholly determinative.[109] Rather, the inquiry remains whether the working environment renders donning and doffing the instant PPE indispensable to safe completion of the Plaintiffs' principal activities.  My analysis now turns to that issue.

In support of their argument that the present drilling activities create a *Steiner* environment, Plaintiffs cite the following dangers inherent to the drilling of

---

[107]  *Busk*, 135 S.Ct. at 519 (emphasis in original). *See also IBP, Inc. v. Alvarez*, 546 U.S. 21, 40-41 (2005)("[T]he fact that certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable' to a 'principal activity' under *Steiner*.").

[108]  *Busk*, 135 S.Ct. at 519.

[109]  *See Gorman v. Consolidated Edison Corp.*, 488 F.3d 586, 594 (2d Cir. 2007)("The donning and doffing of generic protective gear is not rendered integral by being required by the employer or by government regulation.")(collecting cases); *Bonds v. GMS Mine Repair Maintenance, Inc.*, No. 13-CV-1217, 2015 WL 5602607, at *10-11 (W.D.Pa. Sept. 23, 2015)(rejecting plaintiffs' argument that, because an employer required attendance at pre-shift safety meetings, such meetings were integral and indispensable); *Olive v. Tennessee Valley Authority* , No. 15-CV-00350, 2015 WL 4711260, at *3-5 (N.D.Ala. Aug. 7, 2015)(recognizing that, while a Nuclear Regulatory Commission regulation rendered post-shift radiation scans at a nuclear power facility indispensable, "indispensable is not synonymous with integral.").

6,000-foot wells using both potentially dangerous chemicals and machinery.[110]

Plaintiffs focus this *Steiner* argument on their potential exposure to caustic and

other chemicals in the course of their principal activities.[111]  Indeed, they cite the

deposition testimony of their expert Dr. Bishop, who opines on the chemical nature

of drilling mud.[112]  In that deposition, Dr. Bishop stated, in specific relation to this

exposure, that "it's not a question of are these people being exposed to hazardous

chemicals," but rather "how much and for how long."[113]  Even accepting the

veracity of these statements concerning the harmful nature of drilling muds used

(and I note that Defendants vociferously dispute the conclusions of Dr. Bishop[114]

and have advanced their own expert with contradictory findings),[115] this fact in

itself does not tell the whole story.

    In the instant matter, Defendants argue that the existence of additional PPE

in this case renders the instant generic PPE outside the ambit of "integral and

indispensable."  In *Gorman v. Consolidated Edison Corp.,* admittedly a pre-*Busk*

---

[110] Pl.'s Memorandum of Law in Opp. To Defs.' Mot. for Partial Summ. J. (ECF No. 257), at 10.

[111] Pl.'s Memorandum of Law in Opp. To Defs.' Mot. for Partial Summ. J. (ECF No. 257), at 6–7.

[112] *Id.* (citing Dep. of Ronald E.. Bishop, Ph.D. at 78:11-79:16).

[113] *Id.*

[114] *See* Defs.' Reply Br. in Further Support of Mot. for Part. Summ. J. (ECF No. 272), at 10. No motion to strike this expert report has been filed, and, for the purposes of the instant analysis, the Court assumes that this evidence is admissible.

[115] Defs.' Resp. ¶ 52 (citing Expert Report of John M. DeSesso (ECF No. 264-1), at 8).

interpretation of the donning and doffing issues, the United States Court of Appeals for the Second Circuit held that donning and doffing of similar protective gear—helmet, safety glasses, and steel-toed boots—was not "integral and indispensable" to employment at a nuclear power plant.[116] Some courts have since found similar generic personal protective gear to not be integral and indispensable.[117]

However, when the Second Circuit revisited this holding in *Perez v. City of New York*, a post-*Busk* decision, it noted that *Gorman* court did not endorse a categorical rule that generic PPE is **never** integral or indispensable.[118] Rather, although the generic nature of gear may herald that conclusion, the inquiry remains "whether the gear—however generic or specialized—guards against 'workplace dangers" that accompany the employee's principal activities and "transcend ordinary risks.' "[119] "This inquiry requires a fact-intensive examination of the gear at issue, the employee's principal activities, and the relationship between them."[120]

---

[116] 488 F.3d 586, 594 (2nd Cir. 2007).

[117] *See, e.g.*, *Alanis v. Tracer Indus. Mgmt. Co.*, 2016 WL 7551073 (E.D. Tex. Aug. 1, 2016), report and rec. adopted, 2016 WL 4371535 (E.D. Tex. Aug. 16, 2016) (holding that PPE consisting of hard hat, safety goggles, fire retardant clothing, work boots, Kevlar sleeves and H2S monitors was standard safety gear not integral and indispensable to principal work activity of refinery workers); *Stanley v. Car-Ber Testing Texas*, LLC, 2015 WL 3980272 at *8 (E.D. Tex. June 29, 2015).

[118] 832 F.3d 120, 127 (2d Cir. 2016).

[119] *Id.*

[120] *Id.*

Here, the record is replete that, when interacting with potentially hazardous chemicals, Plaintiff workers don additional PPE on the clock. For example, in the Declaration of Mike Skuce, a Vice President of Operations for Precision Drilling Company, L.P., he attests that:

> Additional types of PPE are required for performing certain operations on the rig. For example, employees who are required to mix chemicals in drilling mud will often have to wear a face shield, respirator, rubber gloves and rubber apron. Those items will be donned and doffed by an employee during his shift and "on-the-clock." For employees who are performing work that will expose them to significant amounts of oil based mud, Precision also supplies disposable Tyvek suits or waterproof rain suits which are worn over their coveralls. These items are also donned and doffed "on-the-clock."[121]

The provision of this additional PPE when working with hazardous chemicals is confirmed by (1) Jim Christensen, a rig manager who has throughout the course of his employment worked "on several Precision rigs,"[122] and (2) Shayne Klepper, a ten year employee of Precision who at the time of his deposition was a rig manager.[123]

The existence of this additional, and specialized, PPE is further recognized throughout the factual record by Plaintiffs themselves. For example, in his deposition, Plaintiff James McIvor states the following:

---

[121] Declaration of Mike Skuce (ECF No. 242-1) ¶ 12.

[122] Declaration of Jim Christensen (ECF No. 242-3) ¶ 17; Deposition (ECF No. 242:11), at 32:3-4.

[123] Dep. of Shayne Klepper (ECF No. 242-9) at 49:3-23.

Q. And you agree that the PPE individuals wear protects them from direct exposure to those chemicals?

MR. MOORE: Objection, form.

A. The personnel that are operating or using those chemicals have special PPE to wear.[124]

Plaintiff John Beaver similarly states:

Q. All right. When you would do that, would you have special PPE that you wore to do that job?

A. Yes, you did.

Q. Can you tell us about that special PPE that you would wear?

A. You'd have to wear a respirator, rubber gloves and a rubber apron.[125]

The donning and doffing of additional, specialized gear when working with caustic chemicals is repeatedly echoed by other Plaintiffs to this action.[126]

Faithful application of the summary judgment standard requires that I view all facts in the light most favorable to Plaintiffs and make all reasonable inferences to same. To that end, I must recognize first that *Gorman* presents a rather narrow view of the compensability of generic PPE. Indeed, beyond the treatment rendered by the Second Circuit when it revisited the issue in *Perez*, I note that other courts

---

[124] Dep. of James McIvor (ECF No. 242-12) at 47:16-20.

[125] Dep. of John Beaver (ECF No. 242-22) at 43:19-25.

[126] *See, e.g.,* Dep. of Cody Neufeld (ECF No. 242-10) at 118:17-119:23; 123:2-14; Dep. of Jeremy Outman (ECF No. 242-25) at 24:15-23; 81:24-82:8; Dep. of Michael Volkman (ECF No. 242-31) at 59:24-62:11; Dep. of Kaamil Alghanee (ECF No. 242-32) at 30:5-25; Dep. of Jeremy Mitchell (ECF No. 242-34) at 48: 3-18.

have cautioned against its broad application.  For example, in *Franklin v. Kellogg Co.*, the United States Court of Appeals for the Sixth Circuit noted that "[t]he Second Circuit's position appears to be unique," and that both the "Ninth and Eleventh Circuits have both interpreted *Steiner* less narrowly."[127]  This narrow view was similarly rejected by the Fourth Circuit in *Perez v. Mountaire Farms*.[128]  District Courts have also voiced skepticism.[129]

Furthermore, I note that a genuine dispute of material fact exists concerning the harmful nature of the drilling mud and other chemicals which are commonplace in Plaintiffs' principal duties.  For example, Plaintiffs have advanced the opinion of their expert Dr. Bishop concerning the chemical content of drilling muds and the dangers they pose.  He stated specifically:

> We know what drilling muds have to do. They have to kill the bacteria that form biofilms and plug pores in wells. They have to include corrosion inhibitors because they're drilling holes into hot rock that's also salty, salt water, and highly corrosive, so that the lifetime of steel parts put down into situations like that is a very short lifetime, shorter than they want for the life of the equipment and also for their well.

---

[127]  619 F.3d 604, 619-20 (6th Cir. 2010)(citing *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 910 (9th Cir. 2004);  *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1344 (11th Cir. 2007)).

[128]  650 F.3d 350, 365 (4th Cir. 2011).

[129]  *See, e.g., Spoerle v. Kraft Foods Glob., Inc.*, 527 F.Supp.2d 860, 864-65 (W.D.Wis. 2007); *Anderson v. Perdue Farms, Inc.*, 604 F.Supp.2d 1339, 1351 (M.D.Ala. 2009); *Adams v. Alcoa, Inc.*, 822 F.Supp.2d 156, 164 (N.D.N.Y. 2011)(following *Gorman*, but noting that "[i]t is true that *Gorman*'s interpretation of *Steiner* is unusual and that courts in other circuits have rejected it.").

They also have to include certain lubricants, certain fluid loss additives, and this is before we start talking about special circumstances of high iron in a well or the presence or not of hydrogen sulfide.

So we know what chemicals need to go into these mud mixes simply to do what the muds have to do. And I Know what the range of options are. And all the ranges of options for a working drilling mud, whether its water based or oil-based invert mud, are hazardous chemicals. There are no nonhazardous options for making drilling muds do what they need to do. And there are also very few completely nonhazardous holds in which to drill one you get past about 3,000 feet in depth into the rock.

So it's not a question of are these people being exposed to hazardous chemicals. They are being exposed to hazardous chemicals. At this point the only question is how much and for how long.[130]

Dr. Bishop's Report itself states that the dangers of glycol ether, such as 2-butoxyethanol, exposure, and the presence of the same in Precision drilling fluid additives.[131] The potentially harmful nature of the oil-based mud specifically is corroborated in the testimony of Plaintiff Glenn Hoganson.[132] Therefore, while Defendants vigorously contest the conclusions of Dr. Bishop and advance contradictory expert testimony,[133] his unstricken report and testimony at this stage

---

[130] Dep. of Ronald Bishop at 78:11-79:16.

[131] *See* Expert Report of Ronald E. Bishop, Ph.D., CHO, at 5.

[132] Dep. of Glenn Hoganson (ECF No. 242-20) at 23:6-16 (Q. And in all of your times working on rigs, you got oil-based mud on your skin, right? A. From head to toe. Q. Have you ever gotten sick from it? A. No. But my brother has gotten severely ill from it, which is funny because, you know, I kept telling him, ahh, it's all in your head, it's all in your head. But when he went to the doctor, the blood and skin infections and everything he had were real, and to this day I catch a little gruff from my parents over it.).

[133] Defs.' Resp. ¶ 52 (citing Expert Report of John M. DeSesso (ECF No. 264-1), at 8).

of litigation is sufficient to raise a dispute as to the toxicity of this exposure and the working environment in which Plaintiffs labor.

Defendants essentially argue that, even if accepted by the Court, this toxicity is nevertheless immaterial due to the presence of specialized PPE when mixing chemicals. This contention, however, is unavailing given that the factual record contains instances of Plaintiffs' coveralls, while crafted as flame retardant, being covered by drilling mud and chemicals. Plaintiffs have first noted the deposition testimony of numerous rig managers who conceded that these coveralls often become covered by oil-based mud.[134] Therefore, while Defendants argue that this fact is insignificant given that Plaintiffs are directed to change coveralls when they get covered, I am nevertheless compelled at this stage of litigation to accept the inference and evidence advanced by Dr. Bishop that the purpose of the PPE has the added benefit of limiting exposure to "everything that's on the outside" including this oil-based mud.[135] This "first line of defense" argument against potentially harmful chemicals is further corroborated by the deposition testimony of Plaintiff Glenn Hoganson who stated:

Q.    It can soak through the coverall, can't it?

---

[134] See Dep. of Shayne Klepper (Rig Manager) (ECF No. 242-9) at 44:10-44:24; 48:5-49:2; Dep. of James Joyce (Rig Manager) (ECF No. 242-16) at 25:14-28:20; Dep. of Cody Neufeld (Rig Manager) (ECF No. 10) at 106:22-108:22.

[135] Dep. of Ronald Bishop at 121:4-124:22.

A.      Exactly. It gives you a layer of some protection, but it also --
that's why I was hesitating just asking because it's, again, it's
each situation is different and protection is subject to
interpretation. But as far as keeping oil-based mud off of you
completely, other than a rubber suit with a hose hooked to it for
oxygen, forget it. It's going to get on you.[136]

In sum, when viewing the factual record in the light most favorable to the

non-moving party—Plaintiffs, I conclude that a genuine dispute of material fact

concerning the toxicity of the oil-based mud precludes the entry of summary

judgment in Defendants' favor.   While the instant PPE is essentially "generic" in

nature, I find compelling the Second Circuit's decision in *Perez v. City of New

York* that a finding of "integral or indispensable" is not categorically foreclosed by

genericness.[137]   Rather, the inquiry remains whether the PPE guards against

'workplace dangers" which "transcend ordinary risks.' "[138]   As noted, there is

genuine dispute as to the level of chemical toxicity to which Plaintiffs are exposed.

Considering the evidence of record which implicates the coveralls as a first line of

defense, this dispute prevents the imposition of Defendants' motion for partial

summary judgment on this ground.[139]

---

[136]  Dep. of Glenn Hoganson (ECF No. 242-2) at 22:20-23:5.

[137]  832 F.3d 120, 127 (2d Cir. 2016).

[138]  *Id.*

[139]   I note that Defendants also move for the imposition of summary judgment under the "change
at home rule." As noted above and in complement to settled law, Department of Labor
("DOL") regulations declare that principal activities "include [ ] all activities which are an
integral part of a principal activity." 29 C.F.R. § 790.8(b)(footnote reference
omitted).  Section 790.8(c) also provides the following example of integral activities:

**(2)     Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Compensation Claim for Time Spent Walking Between the Donning and Doffing and Pre and Post-Shift Safety Meeting Locations**

The law is settled that walking time is non-compensable under the Portal to Portal Act when it precedes the start of principal work activities or follows the end of such activities.[140] Walking time, however, becomes compensable if encompassed between principal activities of an employee's workday.[141] Specifically, in that circumstance, the Department of Labor's "continuous workday" rule provides that the exemptions from FLSA coverage under 29 U.S.C.

---

Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance. If an employee in a chemical plant, for example, cannot perform his principal activities without putting on certain clothes, changing clothes on the employer's premises at the beginning and end of the workday would be an integral part of the employee's principal activity. On the other hand, if changing clothes is merely a convenience to the employee and not directly related to his principal activities, it would be considered as a preliminary or postliminary activity rather than a principal part of the activity. However, activities such as checking in and out and waiting in line to do so would not ordinarily be regarded as integral parts of the principal activity or activities. *Id.* § 790.8(c).

In an explanatory footnote, the regulation further states that "[s]uch a situation may exist where the changing of clothes on the employer's premises is required by law, by rules of the employer, or by the nature of the work." *Id.* n. 65. Plaintiffs, in response, question the viability of this decision post-*Busk*. Pl.'s Memorandum of Law in Opp. To Defs.' Mot. for Partial Summ. J. (ECF No. 257), at 21. In the alternative, and assuming the continued viability of this defense, Plaintiffs nevertheless argue, *inter alia*, that the nature of the work prevents Plaintiffs from bringing PPE home. Here, I find summary judgment inappropriate because, pursuant to the above discussion of the nature of work, Plaintiffs have advanced facts from which a reasonable jury may find a take home option illusory. *See Perez v. Mountaire Farms, Inc.*, 601 F.Supp.2d 670, 679 n. 2 (D.Md. 2009).

[140]  *IBP, Inc. v. Alvarez*, 546 U.S. 21, 35-37 (2005).

[141]  *Id.* at 37.

§ 254(a), or the Portal to Portal Act, do not apply to the periods of time between the employee's performance of the first principal activity and the last principal activity of a continuous workday.[142] Here, having found that a genuine dispute as to material fact precludes a finding that donning and doffing is compensable as a matter of law, the same result is compelled for walking time. Indeed, given the existence of a genuine dispute of material fact as outlined above, summary judgment under the continuous workday rule is similarly inapplicable.

> **(3)** **Whether Defendants Are Entitled to Summary Judgment on Plaintiffs Claim that the Failure to Pay this Above Compensation Was a Willful Violation of the FLSA**

Defendants next move for summary judgment on Plaintiffs' claim to the extent it alleges that the failure to pay the above compensation was a willful violation of the FLSA. The FLSA provides two (2) different statutes of limitation: three (3) years if the violation is willful, and two (2) years if it is not willful.[143] An employer willfully violates the FLSA when it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."[144] Furthermore, in explaining this willfulness standard, the Supreme Court in *McLaughlin v. Richland Shoe Co.* noted the following:

---

[142] 29 C.F.R. § 790.6(a); *Alvarez*, 546 U.S. at 37.

[143] *See* 29 U.S.C. § 255(a).

[144] *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

If an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful under either petitioner's test or under the standard we set forth. If an employer acts unreasonably, but not recklessly, in determining its legal obligation, then . . . it should not be so considered under *Thurston* or the identical standard we approve today.[145]

The determination of willfulness is a mixed question of law and fact.[146]

At the outset, I note that, in their brief in opposition, Plaintiffs failed to oppose the issuance of summary judgment on this ground. Plaintiffs can therefore be deemed to have abandoned any argument in favor of a willful violation by Defendants, and thus any request for a three year statute of limitations.[147] However, even reaching the merits of this issue, I note the utter paucity of any evidence from which a reasonable jury could find, by a preponderance of the evidence, that Defendants either knew or suspected that their practices were violative of the FLSA or recklessly disregarded the possibility of same. Plaintiffs have failed to provide any such citations. Furthermore, and as exemplified above, there are no decisions in the Third Circuit concerning whether the donning and doffing of similar PPE or the joint changeover meetings are "integral and

---

[145] *Id.* at 134 n. 13.

[146] *Lugo v. Farmer's Pride Inc.*, 802 F.Supp.2d 598, 618 (E.D.Pa. 2011)(Baylson, J.)(citing *Alvarez v. IBP, Inc.*, 339 F.3d 894, 908 (9th Cir. 2003)).

[147] *Bowser v. Bogdanovic*, Civil Action No. 08-CV-847, 2010 WL 1462548 (M.D. Pa. Apr. 9, 2010) ("[W]hen the moving party argues that summary judgment should be granted in its favor regarding a certain claim, the non-movant abandons that claim by failing to address it in his response to the motion for summary judgment.") (citing *Seals v. City of Lancaster*, 553 F.Supp.2d 427, 432-33 (E.D. Pa. 2008)).

indispensable" to the principal activity of drilling oil and gas wells.[148]  Summary

judgment is therefore granted to the extent Plaintiffs allege a willful violation of

the FLSA, and the applicable statute of limitations is two years.

### B.    Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs have also moved for partial summary judgment in this action.  This

concurrent resolution of cross-motions for summary judgment, as are presented

here, "can present a formidable task."[149]  Indeed, such circumstances may, in some

instances, require separate opinions on the respective motions.[150]  In this case,

however, whether the facts are viewed in the light most favorable to the Plaintiffs

or the Defendants, the same essential narrative unfolds.  Consequently, the present

cross-motions for summary judgment will therefore both be decided in this

Memorandum Opinion and accompanying Order.[151]

---

[148]  *See Lugo v. Farmer's Pride Inc.*, 802 F.Supp.2d 598, 618 (E.D.Pa. 2011)(finding that the "absence of binding Third Circuit precedent on whether donning and doffing PPE is integral and indispensable to the principal activity of poultry processing is relevant to a finding that Defendant did not willfully violate the FLSA").

[149]  *Interbusiness Bank, N.A. v. First Nat'l Bank of Mifflintown*, 318 F.Supp.2d 230, 235 (M.D.Pa. 2004) (Conner, J.) (citing 10A Charles Alan Wright et al., Federal Practice and Procedure § 2720 (3d ed.1998)).

[150]  *See Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968); *United States v. Hall*, 730 F.Supp. 646, 648 (M.D.Pa. 1990)(Nealon, J.).

[151]  *See Interbusiness Bank*, 318 F.Supp.2d at 236 (relying on the mandate of Fed.R.Civ.P. 1 that the Federal Rules of Civil Procedure "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action" in concurrently deciding cross-motions for summary judgment in a single opinion).

In their Motion for Partial Summary Judgment, Plaintiffs move for the judgment on liability, arguing that: (1) pre-shift and post-shift donning and doffing constituted work and was compensable, and (2) all the time walking to and waiting for pre-and post-shift safety/changeover meeting constituted work and was compensable under the continuous workday rule.[152]  In the alternative, Plaintiffs argue that, even if not compensable pursuant to the continuous workday rule, all time spent in mandatory safety meetings is otherwise compensable work.[153]  First, I note that Plaintiffs' Motion for Partial Summary Judgment, to the extent premised on the compensability of pre-shift and post-shift donning and doffing and walking time to pre-and post-shift safety/changeover meeting is hereby denied.

In their Motion for Partial Summary Judgment, Plaintiffs argue, in essence, that summary judgment is appropriate because both the Third Circuit and Supreme Court have recognized that donning and doffing of personal protective gear to be compensable work.[154]  If Defendants' interpretation of the law on this subject is too narrow, Plaintiffs' interpretation is undoubtedly too broad.  A closer reading of both the Third Circuit's decision in *DeAsencio v. Tyson Foods, Inc.*,[155] and the

---

[152]  Pls.' Memorandum of Law in Supp. of its Mot. for Partial Summ. J. (ECF No. 248) at 4.

[153]  *Id.*

[154]  *Id.* at 7.

[155]  500 F.3d 361, 373 (3d Cir. 2007).

Supreme Court's decision in *Sandifer v. United States Steel Corp.*,[156] two decisions cited by Plaintiffs*,* dispels this argument.

For example, in *DeAsencio*, a pre-*Busk* case, the Third Circuit held that, in determining whether donning and doffing in a chicken processing plant was otherwise compensable, the District Court committed error by instructing the jury that "work" necessarily required a "sufficiently laborious degree of exertion."[157] Our Court of Appeals, however, also wrote, to the detriment of Plaintiffs' argument, that "preliminary or postliminary work is non-compensable under the Portal-to-Portal Act if the work is not 'integral and indispensable' to [the] 'principal activit[ies]' of a given job."[158] The Third Circuit thereafter noted that the defendant had withdrawn "any defense that, if work, donning or doffing was not integral or indispensable," and remanded the case to the District Court to determine the preclusive effect of that withdrawal.[159] It did not therefore rule that

---

[156] 134 S.Ct. 870 (2014).

[157] 500 F.3d at 373.

[158] *Id.* (citing *Alvarez*, 546 U.S. at 37).

[159] *Id.* Furthermore, in *Smiley v. E.I. Dupont De Nemours and Company*, 839 F.3d 325, 327-28 (3d Cir. 2016), the Third Circuit did not hold or address whether donning and doffing PPE was *per se* compensable, but rather whether compensation for meal breaks could be offset against overtime liability paid for donning and doffing. Indeed, in the District Court, the parties disputed, but the court assumed without deciding, that the plaintiffs' donning and doffing of personal protective equipment are compensable activities under the FLSA. *See Smiley v. E.I. Dupont de Nemours and Co.*, No. 12-CV-2380, 2014 WL 5762954, at *8 n. 10 (M.D.Pa. Nov. 5, 2014)(Munley, J.).

donning and doffing of personal protective equipment was *per se* compensable sans an integral and indispensable analysis.

Furthermore, Plaintiffs cite *Sandifer v. United States Steel Corp.*, in which the Supreme Court stated in what is admittedly *dicta,* that:

> Because this donning-and-doffing time would otherwise be compensable under the Act, U.S. Steel's contention of noncompensability stands or falls upon the validity of a provision of its collective-bargaining agreement with petitioners' union, which says that this time is noncompensable.[160]

However, in *Sandifer,* the employer was not arguing that changing clothes and washing were not otherwise compensable activities.  Rather, the employer argued that the collective bargaining exception set forth in 29 U.S.C. § 203(o) applied regardless of whether donning the gear was required by law, the employer or the nature of the work.[161]  Thus, whether donning or doffing the protective gear would have been compensable absent 29 U.S.C. § 203(o) was irrelevant to the Court's analysis.[162]  This case therefore offers little guidance here.

Rather, as expressed above, the compensability of the instant donning and doffing of PPE hinges on an "integral and indispensable" analysis as more fully explained above.  I further note that, with all facts viewed in the light most favorable and all reasonable inferences made in favor of the non-moving party—

---

[160]  134 S.Ct. 870, 874 (2014).

[161]  *Id.* at 876.

[162]  *Id.*

Plaintiffs, I found that, because there exists a genuine dispute of material fact concerning Plaintiffs' compensation claim for donning/doffing and walking time, summary judgment in Defendants' favor was not appropriate. Plaintiffs Motion for Partial Summary Judgment, premised on the same factual scenario and with all reasonable inferences drawn in favor of Defendants,[163] is denied.[164]

Plaintiffs also move for summary judgment on an independent and alternative premise. Specifically, to the extent not swept into compensable time by the continuous workday rule, Plaintiffs request that this Court hold that time spent by employees in pre and post-shift safety meetings and crew changeover meetings constitutes "work" and is otherwise compensable.[165] In support of their compensation claim for pre-shift meetings, Plaintiffs argue that all Precision employees attended mandatory pre-tour safety meetings prior to mid-2010, but

---

[163] When presented with cross motions for summary judgment, each movant must show that no genuine issue of material fact exists; if both parties fail to carry their respective burdens, the court must deny the motions. *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1023 (3d Cir.2008).

[164] Further preventing the issuance of summary judgment in favor of Plaintiffs is the genuine dispute of material fact concerning the time spent donning and doffing this non-unique personal protective equipment. *Cf.* Decl. of Jim Christensen (ECF No. 242-3) ¶ 11 *with* Dep. of Rodney Tyger (ECF No. 242-17) at 101:22-103:2. *See, e.g., Alvarez v. IBP, Inc.*, 339 F.3d 894, 904 (9th Cir. 2003)(finding that "donning and doffing" of non-unique protective gear may constitute compensable work activity **but for** the *de minimis* time associated therewith).

[165] Pls.' Memorandum of Law in Supp. of its Mot. for Partial Summ. J. (ECF No. 248) at 26. "Work," however, does not render the safety meetings compensable. Rather, like above, the Court must find them to be "integral and indispensable" to a principal acitivity. *See Bonds*, 2015 WL 5602607, at *10.

retroactive payment was only provided to Pennsylvania employees.[166] In response,

Defendants aver that summary judgment is not appropriate on this claim because

(1) it was neither alleged in the complaint nor conditionally certified, and (2) time

spent in pre-shift meetings is nevertheless non-compensable.[167]

Having reviewed the operative Amended Complaint in this action and the

Memorandum and Order of this Court certifying the instant collective, I am in

agreement with Defendants that this claim for compensation for pre-shift safety

meetings is beyond the scope of alleged violation. Indeed, in the Amended

Complaint, and in addition to the alleged donning and doffing violations, Plaintiffs

allege the following Portal-to-Portal Act violations:

> 36. After donning at the Reporting Location the PPE mandated by
> Defendants and/or OSHA, Named Plaintiffs and Plaintiffs were and
> are required to walk to the safety meeting location ("Meeting
> Location").
>
> 37. Defendants did and do not compensate Named Plaintiffs and
> Plaintiffs for anytime they spend walking from the Reporting
> Location to the Meeting Location or for any time spent from the
> moment Named Plaintiffs and Plaintiffs don their gear until the safety
> meeting starts at the Meeting Location (15 minutes before the official
> "start" time of the shift).
>
> 38. At the end of the shift, Defendants require that Plaintiff and
> Named Plaintiffs attend a safety meeting.
>
> 39. Moreover, Defendants stop paying Named Plaintiffs and Plaintiffs
> at the official end time of their shift, even though the safety meeting

---

[166] *Id.*

[167] Defs.' Br. In Opp. To Pls.' Mot. for Partial Summ. J. (ECF No. 262) at 29.

typically lasts at least 5-10 minutes beyond the end-time of the shift.[168]

Moreover, in their Brief in Support of Conditional Certification, Plaintiffs moved to certify the following allegedly violative practices:

> (1) Defendants' failure to pay hourly rig employees for time spent donning and doffing PPE; (2) Defendants" failure to pay hourly rig employees for time spent walking to and from the donning and doffing location to the safety/changeover meeting location; and (3) Defendants' failure to pay hourly rig employees for time spent in post-shift safety/changeover meetings.[169]

Based on this representation, and finding that the necessary showing had been satisfied, the Court conditionally certified this collective on January 7, 2013.[170]

Under Federal Rule of Civil Procedure 8, a complaint must provide a defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests."[171]  Here, even when construing the Amended Complaint in the light more favorable to Plaintiffs, the Court nevertheless finds that any independent claim[172] for the compensability of these pre-shift safety meetings is absent.  Further complicating the matter, and removing any fair notice to Defendants of this claim,

---

[168]  Am. Compl. (ECF No. 8) ¶¶ 36-39.

[169]  *See* ECF No. 24, at 7.

[170]  *See* ECF No. 49.

[171]  *Williams v. New Castle County*, 970 F.2d 1260, 1265–66 (3d Cir.1992) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

[172]  I am cognizant, however, that any claim for uncompensated time spent in such pre-shift meetings would be rendered compensable under the continuous workday rule **if** a reasonable jury renders the donning and doffing of the instant PPE "integral and indispensable."

is the fact that the Plaintiffs upon which the conditional certification decision was rendered were Pennsylvania employees who admittedly received retroactive pay for these meetings.[173]  Therefore, because Plaintiffs cannot raise a claim for the first time following the close of discovery and at the summary judgment stage, Plaintiffs' motion concerning the compensability of this time is denied.[174]

Plaintiffs are similarly not entitled to summary judgment on their claim for the compensability of time spent in post-shift safety meetings.[175]  In their Motion, they aver that, although Defendants did not record the time hourly rig hands departed the site after attending safety meetings, they move for a ruling that the time spent in such meetings constitutes "work" and thus is compensable.[176]  In response, Defendants argue that they have adduced evidence suggesting that these

---

[173]  *See* Pls.' Memorandum of Law in Supp. of its Mot. for Partial Summ. J. (ECF No. 248) at 26("All employees attended mandatory pre-tour meetings prior to mid-2010, but employees working outside Pennsylvania were never paid retroactively for all meetings."); see also Am. Compl. (ECF No. 8) ¶ 24 ("Named Plaintiffs worked for Precision Defendants at their location in Williamsport, Pennsylvania.").

[174]  *See Martsolf v. JBC Legal Grp., P.C.*, No. 04-CV-1346, 2008 WL 275719, at *2 n.5 (M.D.Pa. Jan. 30, 2008)(citing *Tome v. Harley Davidson Motor Co.*, No. 1:CV-06-2155, 2007 WL 3125090, at *7 (M.D.Pa. Oct. 24, 2007); *Shingara v. Skiles*, No. 1:04-CV-0621, 2007 WL 210800, at *3 n. 5 (M.D.Pa. Jan. 24, 2007); *Protocol Elecs., Inc. v. Transolutions, Inc.*, No. Civ. 03-4162, 2005 WL 1106132, at *5 (D.N .J. Apr. 29, 2005); *Krouse v. Amer. Sterilizer Co.*, 126 F.3d 494, 499 (3d Cir. 1997).

[175]  I note that Defendants argue rather extensively that a post-shift safety meeting is not common to the collective as a whole. *See* Defs.' Br. In Opp. To Pls.' Mot. for Partial Summ. J. (ECF No. 262) at 27. Indeed, in the brief in support of their motion for summary judgment, Defendants argue that they will be moving to decertify the collective on this ground. *See* Defs.' Br. in Supp. of Mot. for Partial Summ. J. (ECF No. 241), at 1 n. 1. This commonality argument is properly reserved for that vehicle.

[176]  *See* Pls.' Memorandum of Law in Supp. of its Mot. for Partial Summ. J. (ECF No. 248) at 27.

meetings rarely ran late. Furthermore, if these meetings did run late, it was in a *de minimis* amount of time, and was often offset by meetings that ended early.[177] This dispute concerning the compensability of this time under the *de minimis* doctrine is confirmed by the declarations of rig managers Jim Christensen, Shayne Klepper, Cody Neufeld, and Dale Quigley.[178] In denying summary judgment on December 18, 2012 prior to the conclusion of discovery, I noted that "[t]he parties also dispute the amount of time plaintiffs spent in end-of shift meetings and how often those meetings extended past the official shift end time."[179] Because this dispute remains following the conclusion of discovery, summary judgment concerning the compensability of these meetings is improper.[180]

## V. CONCLUSION

Based on the above reasoning, Defendants' Motion for Partial Summary Judgment is granted in part and denied in part. The Motion is granted with respect to Plaintiffs' claim on the applicable statute of limitations.

Plaintiffs' Motion for Partial Summary Judgment is denied in its entirety.

---

[177] Defs. Br. in Opp. To Pls.' Mot for Summ. J. (ECF No. 262) at 29.

[178] Decl. of Jim Christensen (ECF No. 242-3) ¶¶ 8-9; Decl. of Shayne Klepper (ECF No. 242-4) ¶¶ 9-10; Decl. of Shayne Klepper (ECF No. 242-5) ¶¶ 8-9; Decl. of Dale Quigley (ECF No. 242-6) ¶¶ 12-13.

[179] ECF No. 48.

[180] *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946)("[I]t is appropriate to apply a de minimis doctrine so that insubstantial and insignificant periods of time spent in preliminary activities need not be included in the statutory workweek.").

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
United States District Judge