# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RODNEY TYGER, *et al.*,

        Plaintiffs,

    v.

PRECISION DRILLING CORP. *et al.*,

        Defendants.

No. 4:11-CV-01913

(Chief Judge Brann)

## MEMORANDUM OPINION

### MARCH 25, 2022

"[A] fair day's pay for a fair day's work."[1] That was the promise of the 1938 Fair Labor Standards Act. But in practice, this promise has proven easier stated than applied. While the Act generally requires employers to compensate their employees for time they are required to be at work, Congress has carved out two exceptions, one for "travel to and from the location of the employee's 'principal activity,'" and the other for "activities that are preliminary or postliminary to that principal activity."[2] And this case—involving a class of oil rig workers seeking backpay for time spent walking back and forth from their rigs to change in and out of their steel-

---

[1] *A.H Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (citing Franklin D. Roosevelt, Message of the President to Congress, May 23, 1937).

[2] *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690–91 (1946); *IBP, Inc. v. Alvarez*, 546 U.S. 21, 28 (2005); *see generally* Fair Labor Standards Act of 1938 (codified at 29 U.S.C. § 201 *et seq.*); Portal-to-Portal Act of 1947, (codified at 29 U.S.C. § 254(a)).

toed boots, hard hats, safety glasses, fire retardant coveralls, gloves, and earplugs—implicates both.

Quite a bit then hinges on what "principal activity" encompasses. Though not defined by the statute, the Supreme Court has determined that the term "embraces all activities which are an 'integral and indispensable part of the principal activities.'"[3] The question here is whether donning and doffing basic personal protective equipment ("PPE") was "integral and indispensable" to the oil rig workers' principal activities. And that, as I'll explain, turns on whether this PPE guards against workplace hazards that accompany those activities and transcend ordinary risks.[4]

Because I find that the donning and doffing of the basic PPE at issue here does not meet this standard, I grant Precision Drilling and its various affiliates' motion for summary judgment on the Plaintiff Employees' remaining claims under the Fair Labor Standards Act. The Employees' cross-motion, which conversely asks that I find Precision Drilling liable under the Act, is accordingly denied.

## I.    FACTS

Precision Drilling operates oil and gas drilling rigs.[5] The work is intense—rigs are generally staffed by two crews that alternate 12-hour drilling shifts, often

---

[3]    *Steiner v. Mitchell*, 350 U.S. 247, 252–53 (1956).

[4]    *See Perez v. City of New York*, 832 F.3d 120 (2d Cir. 2016).

[5]    Doc. 392-2 ¶ 1; Doc. 404 ¶ 1.

for multiple weeks in a row—and it is not free of hazards.[6] Indeed, these hazards, and the protection provided by the basic PPE that Employees don and doff each day, are now at the center of this suit.[7] I'll begin by detailing the three types of hazards the Employees have homed in on, before addressing the protection this PPE provides.[8]

### A.   Hazards of the Job

### 1.   Mechanical Risks

The Employees begin by highlighting an array of mechanical risks their job entails, most of which Precision Drilling acknowledges.[9] The Employees note that their eyes may be exposed to pieces of metal, dirt, and dust; that their hands may be "pinche[d], burn[ed], blister[ed], bruise[d], [or scratched]"; and that their toes may

---

[6]   Doc. 393 ¶¶ 3–5; Doc. 401 ¶¶ 3–5. Rig workers are compensated at a time-and-a-half rate once they exceed a forty-hour workweek. Doc. 392-2 ¶ 6; Doc. 404 ¶ 6.

[7]   Despite rulings that have narrowed the issues in this case, the fact-related filings exceed 100 pages. *See* Doc. 392-2 (Defendants' Statement of Undisputed Facts in Support of Renewed Motion for Summary Judgment); Doc. 393 (Plaintiffs' Statement of Undisputed Material Facts); Doc. 401 (Defendants' Response to Plaintiffs' Statement of Undisputed Material Facts on Renewed Motion for Summary Judgment); Doc. 404 (Plaintiffs' Answer to Defendants' Statement of Facts in Support of Motion for Partial Summary Judgment). As a result, I have attempted to highlight the material most relevant to the remaining claims—with particular attention paid to material the parties cite in their briefing. Facts relating to Precision Drilling's supposed take-home policy are not addressed. For a broader treatment of the facts of this case, *see Tyger v. Precision Drilling Corp.* (*Tyger I*), 308 F. Supp. 3d 831, 835–39 (M.D. Pa. 2018).

[8]   Doc. 393 at 4, 5, 7 (setting out in separate sections "Mechanical Risks," "Fire and Burn Risks," and "Exposure To Drilling Fluids and Hazardous Materials").

[9]   *See* Doc. 401 ¶¶ 11–16. Here, Precision Drilling either acknowledges the risk (though sometimes with the caveat the risk is irrelevant given the type of PPE donned), *id.* ¶¶ 12–15, or emphasizes that these are the sort of "hazards and risks that exist in industrial workplaces and construction sites generally, not hazards and risks that are an intrinsic element of drilling oil and gas wells." *Id.* ¶¶ 11, 16.

be "crushed."[10] They also describe how they may suffer hearing loss from workplace noise.[11] And they further assert that "cementing . . . 'can cause severe damage'"—though the Employees leave the magnitude of these risks, and the particularities of the cementing process, otherwise unexplained.[12] In addition, the Employees' statement of facts delves into how during "tripping pipe" operations they are again exposed to danger when they lift, by elevator, drilling materials weighing in the thousands of pounds before "lower[ing] [them] into the bore hole for drilling."[13]

The Employees relatedly claim that objects may be dropped on their head, with deadly consequences.[14] The Employees at first rested this assertion on a statement in Precision Drilling's Safety Manual: "[t]ools dropped from a height have caused significant injuries, including fatalities."[15] But in an attachment to their reply brief, they now seek to bolster this claim with documents relating to a workplace incident.[16] In particular, the Employees highlight three documents showing that in

---

[10]   Doc. 393 ¶¶ 11, 15–16 (detailing risk to the eyes and hands); Doc. 401 ¶¶ 11, 15–16 (same); Doc. 395 at 12–13 (admitting the risk to workers' toes).

[11]   Doc. 393 ¶ 16; Doc. 401 ¶ 16; Doc. 242 at 22:8–9 (Deposition Testimony of Michael Adkins) ("Earplugs protect workers from hearing loss."). The Employees delve further into this risk in their response to Precision Drilling's statement of facts. *See* Doc. 404 ¶ 43 (citing Doc. 242-14 at 29:21–22) (Deposition Testimony of Brian Shulte) ("I'm deaf because I didn't wear [ear protection] because it wasn't a rule.").

[12]   Doc. 393 ¶ 14; Doc. 401 ¶ 14.

[13]   Doc. 393 ¶ 12; Doc. 401 ¶ 12.

[14]   Doc. 393 ¶ 13.

[15]   Doc. 282-1 at 170.

[16]   *See* Doc. 405-1; Doc. 405-2; Doc. 405-3; Doc. 405-4; Doc. 405-5; Doc. 405-6. Precision Drilling objects to the consideration of these documents under the summary judgment standard's admissible evidence requirement. Doc. 406 at 9.

2014, a North Dakota-based rig hand was struck by a pin that fell some 80 feet, causing him a serious brain injury.[17]

Beyond this North Dakota incident, the Employees' reply brief attachment also highlight two other accidents, both of which are unrelated to drop risks but seem to fall within the broad ambit of "Mechanical Risks."[18] One attachment, a Canadian court decision, describes a 2010 incident in Alberta, Canada, where a rig hand died from blunt force trauma and cranial fractures during a work process called "tripping out."[19] At the same time, two other attachments center on an incident that occurred in the mid-2010s, when a rig hand died after being backed over by a front loader.[20]

### 2. Fire and Burn Risks

The second category that the Employees highlight is fire and burn risks.[21] To start, the Employees emphasize the risk of blowouts, leading to "violent" and "uncontrolled" releases of gas, which in their view create both an "explosion" and "burn risk."[22] Precision Drilling takes issues with a few parts of this claim. For one, it contends that the Employees garble the mechanism of the risk, emphasizing correctly that nothing in the testimony that the Employees cite discusses the "risk of

---

[17]   *See* Doc. 405-1 (Precision Drilling's Root Cause Incident Assessment for Robby Williams Incident); 405-2 (Precision Drilling's Preliminary Investigation Details for Robby Williams Incident; Doc. 405-5 (Deposition Testimony of Robby Williams).

[18]   Precision Drilling raises the same admissible evidence objection to these documents as well. Doc. 406 at 9–11.

[19]   Doc. 405-4.

[20]   Doc. 403-3 (Deposition Testimony of Caleb White in suit brought by David Dunn); Doc. 403-6 (Deposition Testimony of Dale Quigley in suit brought by David Dunn).

[21]   Doc. 393 at 5.

[22]   *Id.* ¶ 17.

explosion."[23] The Company further clarifies "that there is not burning risk from drilling fluid in a blowout," the risk, rather, comes only "from the gas that follows it."[24] Second, Precision Drilling adds that the Employees' descriptions lack context and stresses that the cited testimony states that blowouts are "rare."[25] Indeed, neither party has drawn the Court's attention to evidence of this sort of event happening on a Precision Drilling rig.

The Employees also note the potential fire and burn risks from diesel fuel, a flash fire causing "combustible" added to oil-based drilling muds, which Precision Drilling uses to lubricate drill bits, remove drilling tailings (rocks and dirt) from the well bore, and prevent well collapses during drilling.[26] To support their assertion, the Employees tie together Precision Drilling's Vice President of Operations' declaration that a common type of drilling mud is an oil-based mud (with the base

---

[23]  Doc. 242-9 at 82:3-14 (Deposition Testimony of Rig Manager Shayne Klepper).

> Q.  What is a blow-out?
> A.  A blow-out is an uncontrolled release of the oil or the drilling fluid out of the well.
> Q.  Okay. And have you ever been on a rig where that's happened?
> A.  No. Blow-out is bad.
> Q.  Sure. Is it pretty rare?
> A.  In Precision Drilling, yes.
> Q.  Okay.
>
> *Id.*

[24]  Doc. 401 ¶ 17. As I'll explore later, Precision Drilling further contends that "none of the basic PPE protects against exposure to vapors. Only a respirator which is donned on the clock provides such protection." *Id.*

[25]  *Id.* (noting that in Shayne Klepper's Deposition testimony, Doc. 242-9 at 82, he confirmed that blowouts are rare).

[26]  Doc. 393 ¶ 19 (alleging that the drilling mud is a combustible that can cause flash fires); Doc. 242-1 ¶ 9 (Declaration of Michael Skuce, Precision Drilling Vice President of Operations) (detailing the purpose of drilling muds).

often being diesel fuel), and a Company Material Safety Data Sheet that states: "WARNING! Combustible liquid and vapor. – Can cause flash fire."[27] But Precision Drilling has qualms with theory as well. It counters that the Employees cite nothing showing that diesel is still combustible in drilling mud or that anyone has ever been exposed to a flash fire from it.[28]

Finally, in this section the Employees return to the risk caused by cementing (also mentioned as a mechanical risk), emphasizing that working "with hot liquids such as cement" may cause burns.[29] But once again, the testimony they cite does not shed any light on how likely workers are to touch hot cement during the process.[30]

Besides these risks, which the Employees highlight in their own statement of facts, they also contend in their response to Precision Drilling's statement of facts that Precision Drilling rig hands "have been badly burned by fires."[31] In making this

---

[27]  *See* Doc. 242-1 ¶ 10 ("Precision Drilling rigs can use several different types of drilling mud. The two most common types of drilling mud are referred to generally as Oil-Based Mud, and Water-Based Mud. Oil-Based Mud . . . is a generic term used to refer to drilling mud that contains some type of chemical compound, often oil-based, and most frequently diesel fuel. Water-Based Mud does not contain such compounds. There are many different types of [Oil-Based Mud], containing different chemical compounds. The type of drilling mud used is determined by the Operator. Not all Precision rigs use [Oil-Based Mud], and even those that do will not necessarily use it every day of drilling. The type of drilling mud selected for use in a particular well on a particular day is determined by the Operator."); Doc. 394-4 at 17 (CITGO No. 1 Diesel Fuel, All Grades, Material Safety Data Sheet).

[28]  Doc. 401 ¶ 19.

[29]  Doc. 393 ¶ 20.

[30]  *See* 284-3 at 59–61 (Deposition Testimony of Precision Drilling Healthy, Safety, and Environmental Manager, Lawson Threeton). Threeton's cited testimony instead centers on the role that fire retardant coveralls play in reducing this risk. *Id.*

[31]  Doc. 404 ¶ 42.

claim, they cite the deposition testimony of Glenn Hoganson, a rig hand with over three decades of experience across some fourteen-odd drilling companies:[32]

> Q.    Have you ever seen a fire on a rig?
> A.    Yes, I have.
> Q.    And have you ever seen a fire get close to a guy who is wearing a coverall?
> A.    No. We evacuated the rig and the company men, but I have personal knowledge of the crew that—the driller that took my job when I left cyclone [and] went to work for Precision. Rig 18 caught on fire. The driller, the motor hand[,] and the floor hand were burned 90 percent of their bodies. It almost killed both of them. They spent over two years in the hospital. The rig burned to the ground. The derrick went over in two and a half minutes. Okay. These are—those two cats I've known my whole adult life since I was in my twenties.[33]

### 3.    Exposure to Drilling Fluids and Hazardous Materials

The third category of risk identified by the Employees is their exposure to drilling fluids and hazardous materials.[34] At a basic level, the Employees contend that while drilling oil and gas wells, they are exposed to drilling muds—and that these drilling muds are hazardous.[35] Their case is built on Precision Drilling's

---

[32]   Doc. 242-20 at 16:21–22 (Deposition Testimony of Glenn Hoganson) ("I had like 14 different drilling companies in the 36 years I worked").

[33]   *Id.* at 41:12–42:3.

[34]   Doc. 393 at 7.

[35]   *Id.* ¶¶ 23, 24, 26. The Employees make claims about each type of drilling mud. *See id.* ¶ 29. They argue that "[s]o-called 'water[-]based mud' contains sodium hydroxide ('caustic') which can cause burns to eyes, skin and respiratory tract." *Id.* Though Precision Drilling counters that "additional PPE is required when working with caustic to avoid these harms. Doc. 401 ¶ 29. Likewise, the Employees note that "'synthetic[-]based mud' exposure can be harmful to health." Doc. 393 ¶ 29. While also contending that "[o]il-based mud contains hydrocarbons (most often diesel fuel) as a base and readily causes skin rashes," and that "'[g]el-based' mud contains 'bentonite, lime, and sometimes caustic.'" *Id.* But here too Precision Drilling counters additional PPE is required "when a rig is required to mix chemicals in drilling mud . . . ." Doc. 401 ¶ 29.

Material Safety Data Sheets, its Safety Manual, and the deposition testimony of its workers and managers.[36]

The Employees begin by citing the Safety Sheets of chemicals added to the Company's drilling mud: Geltone V, MICA, FLR, FM WA II, barite, lime, and diesel fuel.[37] The *relevant* risks posed by these chemicals are pretty much the same.[38] The Safety Sheets warn that the chemicals may cause skin and eye irritation; and to address any irritation, the Sheets recommend that workers remove contaminated clothing, wash their skin with soap, flush eyes their eyes with water, and seek medical attention if the problem persists.[39]

---

[36]   *See* Doc. 393 ¶¶ 27–47.

[37]   *Id.* ¶ 28.

[38]   *See* Doc. 394-4 at 10–32.

[39]   The following, in particular, were cited in the Employees' statement of facts. *See* Doc. 393 ¶ 28.

- Geltone poses an "acute health hazard" and "[m]ay cause eye, skin, and respiratory irritation." Doc. 394-4 at 21. As a first aid measure the Material Safety Data Sheet recommends to "[w]ash [skin] with soap and water[,] [and] [g]et medical attention if irritation persists." Id. Likewise, in case of eye contact, it instructs workers to "immediately flush eyes with plenty of water for at least 15 minutes and get medical attention if irritation persists." *Id.*

- MICA also poses an "acute health hazard," as it "[m]ay cause eye . . . irritation." *Id.* at 27. Skin irritation is not listed as a hazard, But under first aid measures, it includes for "skin," to "[w]ash with soap and water[,] [and] [g]et medical attention if irritation persists." *Id.* At the same time, for "eyes" it states, "[i]n case of contact, immediately flush eyes with plenty of water for at least 15 minutes and get medical attention if irritation persists." *Id.*

- FLR "[d]ust may be irritating to the eyes. [And while it] [s]hould not be an irritant to the skin . . . . [it] [m]ay aggravate dermititis [sic]." *Id.* at 13. As a first aid measure, the Safety Sheet recommends flushing eyes for 15 minutes, if they are irritated, washing skin with soap and water, and seeking medical attention if a rash develops. *Id.*

- FM WA II "[m]ay cause irritation" to eyes and skin. *Id.* at 14. The Safety Sheet notes that "[i]rritation may be become severe with prolonged contact." *Id.* Under first aid measures for eyes, it states, "immediately flush with plenty of water for 15 minutes[,] [and then] [s]eek medical attention." *Id.* For skin, meanwhile, it says to "[w]ash with soap and water[] [and] [r]emove and clean contaminated clothing." *Id.*

The Employees also point to similar warnings in the Precision Drilling Health Safety & Environmental Field Reference Manual, though they encompass a different array of chemicals.[40] For "[c]austic, lime, soda, ash, calcium chloride, [and] chlorine," the Safety Manual warns, "[m]ay seriously burn the skin, eyes, and nose membranes and the lungs."[41]

According to the Employees, this risk of skin irritation has been borne out. They highlight that various "[w]orkers and managers testified that they and others developed reactions consistent with the warning provided on the [Material Safety

---

- Barite "[m]ay be irritating to the skin" and "eyes." *Id.* at 10. The recommended first aid measure for skin contamination is to "[w]ash skin thoroughly with soap and water[,] [r]emove contaminated clothing[,] [and] [g]et medical attention if any discomfort continues." *Id.* at 11. For eye exposure, the Safety Sheet recommends to "[p]romptly wash eyes with lots of water while lifting the eye lids[,] [c]ontinue to rinse for at least 15 minutes[,] [and] [g]et medical attention if any discomfort continues." *Id.*
- The Employees include only part of the Material Safety Data Sheet is included for lime, and thus the potential effects on the Employees' skin and eyes are unclear. *Id.* at 16. On this front, I'll also note that elsewhere in their statement of facts they claim that "Lime (a mud additive listed in Precision's HSE Manual) causes 'severe irritation' to the skin, and 'extreme irritation of eyes . . . including burning and tearing. . .'" Doc. 393 ¶ 35 (citing Doc. 394-4 at 16). While those quotes may well have come from a portion of the Material Safety Data Sheet that was cut off, they do not appear in the single page included in the exhibit that the Employees quote.
- Diesel fuel "[l]iquid contact can cause eye or skin irritation." Doc. 394-4 at 17. The Sheet instructs to "[a]void skin contact," but "[i]f [the] product comes in contact with clothing, [workers should] immediately remove soaked clothing and shower." *Id.* at 18. *See also* Doc. 393 ¶¶ 36–37 (highlighting the risks that this Sheet identifies).

[40] *See* Doc. 393 ¶ 33. The Employees cite to Doc. 282; however, the page the material appears on is actually found in Doc. 283 at page 7. For gel and barite, Precision Drilling's Manual warns of the potential hazard of "[b]reathing a large amount over a long period[, which] could cause silicosis or other respiratory problems." Doc. 283 at 7. As none of the PPE being battled over in this case protects against this risk, I find this risk irrelevant.

[41] Doc. 283 at 7. The chart also includes that "[c]hromate and chrome thinners (bichromate, dichromate, and thinners such as Spersene, Unical, or Q-Broxin)" pose a potential hazard: "[c]hromate is absorbed through the skin and can cause poisoning." *Id.* To my knowledge, neither party has discussed these chemicals' role in the drilling process or shed any light on how a worker may be exposed to them.

Data Sheets] when their skin was exposed to the drilling fluids."[42] Some workers

deposed (the Employees cite six) report experiencing skin irritation themselves.[43]

By and large, these individuals reported getting a red rash.[44] Three emphasized that

it was itchy.[45] Two noted that theirs often came with blisters, which sometimes got

---

[42]   Doc. 393 ¶ 41.

[43]   *See id.*

[44]   *See* Doc. 242-28 at 41:21–25 (Deposition Testimony of Brandon Weeden) ("Q. Did you ever get invert or oil-based mud on your skin? A. I did, yes. Q. Did it cause—sorry. Did it cause you any health problems? A. I had a rash, like, an itchy, red rash I used to try and—yeah, I tried to keep it off of me as much as possible."); Doc. 242-34 at 51:7–17 (Deposition Testimony of Jeremy Mitchell) ("Q. We talked about the invert and oil-based mud. Did you ever have any illness or sickness or a rash that you related to that? A. Rash. Q. What kind of rash did you get? A. I'm not a doctor, but it was just a rash over the outer parts of my body. Q. And—and where was the rash? A. Arms, legs, hands, neck area, places that would rub."); Doc. 335-4 at 61:5–61:24 (Deposition Testimony of Jeff McWilliams) ("Q. So the coveralls doesn't protect you as a floorhand from drilling mud, does it? A. Yes, it keeps—it keeps it off your skin on most occasions. Q. Okay. But it can soak through the coverall and get on your skin? A. Yeah, if you—like I said if you get doused yeah. Q. So you've had it on your skin? A. Yes. Q. Have you ever gotten sick from it? A. Yes. Q. Okay. Describe your sickness that you associate with getting oil-based mud on you. A. Rash. Q. Anything—any other symptoms? A. Not to my recollection."); *see also* Doc. 242-18 at 148:21–149:11 (Deposition Testimony of Shaun Wadsworth); Doc. 242-19 at 44:17–24 (Deposition Testimony of Robert Goodwyn).

[45]   *See* Doc. 242-28 at 41:23 (Deposition Testimony of Brandon Weeden) ("I had a rash, like an itchy, red rash"); Doc. 242-18 at 149:3–11 (Deposition Testimony of Shaun Wadsworth) ("Q. Did it give you a rash? A. I don't know if you would call it a rash, but it would turn like red. Q. Okay. A. It wasn't a rash, like itchy rash. It would just turn red and be like a slight burning or something, but only for a couple of minutes and then it would be red for like a day and then it goes away."); Doc. 242-19 at 44:17–24 (Deposition Testimony of Robert Goodwyn) ("Q. And what happened when you would get oil[-]based mud on your skin? . . . . Oh, man. Bad things. Red rashes, really itchy, and then it would dry out really bad, and then you'd get pimples, like loads and loads of pimples.").

infected.[46] And one reported an outbreak of pimples.[47] But none sought medical attention; their rashes seem to have simply gone away.[48]

These rig workers' experience is confirmed by their compatriots, and their bosses.[49] For instance, in Precision Drilling Rig Manager James Christensen's deposition testimony, he acknowledged that "some people are really susceptible to rashes and whatnot," so the Company supplies them with a barrier cream that acts as "a second skin that stops any sort of chemicals from attacking your skin."[50] Meanwhile, veteran rig hand Glenn Hoganson spoke about his brother seeing a

---

[46] Doc. 242-27 at 74:12–18, 77:8–78:20 (Deposition Testimony of George Hollabaugh) ("Q. Mr. Hollabaugh, let me go back to ask you some questions about the invert. You said—did it irritate your skin if you got invert on your skin? A. Yes, it did. Q. What did it do to your skin? A. Gave me rashes and blisters. . . . Q. Other than getting rashes—and I'm not trying to minimize that, all right, because I can imagine it could be pretty painful—any other physical effects that you suffered as a result of being exposed to invert? A. If you had any cuts or open wounds, they would get infected, and you usually weren't able to get them cleared up until you had some time off. Q. And the only thing you were able to do to treat the rash was to put baby oil on it? A. Baby oil, you know, and when you got off, make sure you're bathing and scrubbing and taking care of yourself.").

[47] Doc. 242-19 at 44:17–24 (Deposition Testimony of Robert Goodwyn).

[48] *See* Doc. 335-4 at 61:25–62:3 (Deposition Testimony of Jeff McWilliams) ("Q. How did you treat the rash? A. I didn't. Q. Did it go away? A. Yeah. Just deal with it."); Doc. 242-18 at 149:7–11 (Deposition Testimony of Shaun Wadsworth) ("It wasn't a rash, like itchy rash. It would just turn red and be like a slight burning or something, but only for a couple of minutes and then it would be red for like a day and then it goes away.").

[49] *See* Doc. 242-21 at 124:13–22. (Deposition Testimony of Michael Volkman) ("Q. Michael, did you ever work with anybody that go skin rashes? A. Ethan and Bradley Howard, two Louisiana boys, they broke out pretty good from the invert mud. Q. That was from the mud? A. Yeah. We had like a specialty cream on the rig. It would them guys for the rash. I was a fortunate one that didn't break out from the stuff. Those guys, yeah, they were pretty rough there a couple of days."); Doc. 335-5 at 52:22–25 (Deposition Testimony of Precision Drilling Rig Manager Beau Turner) ("Q. Have you seen anyone on your crews get a skin rash from working with invert? A. I've seen people with a skin rash believed to be caused from invert, yes.").

[50] *See* Doc. 242-11 at 30:15–32:9 (Deposition Testimony of Precision Drilling Rig Manager James Christensen).

doctor after a drilling fluid-caused rash gave him blisters, which were then infected; in the end, however, he had no lasting ill-effects.[51] Hoganson also claimed that invert mud "inflamed" some rig hands' hair follicles and caused other rig hands' cuticles to split, which in his view "allow[ed] a passageway for getting to [their] bloodstream" and resulted, once, in "a guy's hand [getting] really bad."[52]

---

[51]   *See* Doc. 335-5 (Deposition Testimony of Glenn Hoganson). Though I'll note that it's not clear that this infection occurred on a Precision Drilling rig—Hoganson reported having worked for some 14 companies over his three-plus decade career:

> Q.   And in all of your times working on rigs, you got oil-based mud on your skin, right?
> A.   From head to toe.
> Q.   Have you ever gotten sick from it?
> A.   No. But my brother has gotten severely ill from it, which is funny because, you know, I kept telling him, ahh, it's all in your head, it's all in your head. But when he went to the doctor, the blood and skin infections and everything he had were real, and to this day I catch little gruff from my parents over it.
> Q.   And you believe that—did some doctor tell you that was related to getting invert on him?
> A.   It was caused by invert. It was on his wrist and on his ankles where the skin got exposed and he got blisters and then the blisters got infected. And, of course, we're working 14 days and he was working motors for me and I put pressure on him to just salve it up and throw a Band-Aid on it, it will be okay.
> Q.   And he got an open would and it got infected?
> A.   Yep.
> Q.   And did he recover from that?
> A.   Oh, yeah. And then we learned about always wearing more protective clothing doing certain things and the importance of changing your coveralls and stuff immediately instead of leaving them dirty on you. . . .

*Id.* at 23:6–24:10.

[52]   *Id.* at 130:8–24. Precision Drilling contends that in making these statements, Mr. Hoganson was responding to a hypothetical. *See* Doc. 406 at 16–17. That's true. *See* Doc. 242-20 at 130:8–9 ("Q. Glenn, what would invert do to your nails if you were exposed to invert and you weren't wearing rubber gloves underneath work gloves[?]"). My read of his testimony is that he believed that doing so would allow mud into rig hands' bloodstream, but that workers' cuticles cracking and hair follicles becoming inflamed was something he had witnessed firsthand. *See id.* at 130:11-17 ("A. Well, I'd like to use OMG there, because right now what you're doing is you're allowing a passageway for getting to your bloodstream, because cuticles will split and fall apart and they'll actually start bleeding and it will get so bad that you can't hard—I mean, I've seen it where a guy's hand got really bad. Plus it will get in your hair [and your] follicles can get inflamed.").

For the most part, Precision Drilling acknowledges that the workers may experience a rash from the chemicals added to drilling mud.[53] The Company instead takes issue with the Employees' claims at the margin.[54] For instance, it emphasizes that exposure is not universal: not every rig uses oil-based drilling mud—and when the rig does, not every worker is exposed.[55] Precision Drilling further contends that its workers are required to wear additional PPE when they are exposed to significant amounts of drilling mud or hazardous quantities of concentrated chemicals, such as when they mix the chemicals. But above all else, the Company maintains that when a rig does use chemical-based drilling mud, the Employees' day-to-day exposure is not hazardous.[56]

The disagreement is starker on the Employees' remaining claims, which unlike their skin irritation claims, cite only to Material Safety Data Sheets. To start,

---

[53]   *See* Doc. 401 ¶ 41 ("Some rig hands have had skin rashes as a result of exposure to oil-based drilling mud. Some workers on some rigs have reported skin irritation from exposure to oil-based drilling mud, including rashes, from which their PPE does not provide protection.").

[54]   *Id.*

[55]   *Id.* ¶¶ 24–25, 41.

[56]   *See e.g., id.* ¶¶ 29, 31, 33–45. The Employees do not admit to these claims. They first counter that when Precision Drilling's rigs use oil-based mud, they do so every day. Doc. 404 ¶ 31. As evidence, they posit, "rig hands received oil[-]based mud pay for every day oil-based mud was present, indicating that rig hands worked with oil[-]based mud each day it was present on site." *Id.* Beyond being a bit circular, this claim appears to be on a different track: Precision Drilling does not claim that it doesn't use oil-based mud consecutively when it is used, rather the Company is claiming that it's not always used—which is beyond dispute. The Employees likewise contend that workers exposure does not vary, pointing to the fact that drillers (who Precision Drilling claimed were less likely to be exposed) "received the same amount of oil[-]based mud pay as any other rig hand when working with oil[-]based mud." *Id.* ¶ 37. And because Precision Drilling's "purported justification for oil[-]based mud pay is a non-wage expense reimbursement (as opposed to hazard pay). . . . [Precision Drilling's] factually binding justification for such oil[-]based mud pay indicates that drillers are therefore equally as likely to be exposed to oil[-]based as any other position on the rig." *Id.*

the Employees assert that the Company's "rigs regularly use chemicals in drilling mud such as 'EZ Mul' and 'Baraklean.' [And that] [p]rolonged or repeated exposure to Baraklean may cause testicular toxicity, embryo and fetus toxicity."[57] This claim seizes on a statement listed under the "chronic effects" of Baraklean on its Safety Sheet.[58]

Similarly, the Employees point to the Safety Sheet for FM Vert Mud/Slurry for a few other broad declarations.[59] First, they assert that "[e]xposure to drilling fluids on Precision rig sites may present 'eye irritation,' 'skin and mucous membrane irritation,' 'gastrointestinal distress,' 'nervous system effects such as drowsiness, dizziness, headaches, nausea or blurred vision.'"[60] Then they contend that breathing in this chemical "may cause serious lung damage."[61] And finally, the Employees quote the following Safety Sheet claim:

> [The] [c]hronic effects of exposure to oil[-]based drilling muds include "dermatitis and/or kidney damage from prolonged exposure. Some components of diesel have been determined to cause skin tumors and/or cancers in laboratory mice, but the effect on humans has not been determined. May be harmful if inhaled over long periods of time."[62]

---

[57]   Doc. 393 ¶ 42 (quoting Doc. 287-1 at 71).

[58]   *See* Doc. 287-1 at 71 (listing the toxicological information for Baraklean). While the Employees provide no citation directing the court to the Safety Sheet for the chemical EZ Mul, it can be found in Doc. 288-1 at 12–17. Under "Chronic Effects/Carcinogenicity" it lists that "[r]epeated overexposure may cause liver and kidney effects," but it contains no such claim about reproductive toxicity. *Id.* at 14. Still, it does note that it may cause skin irritation and severe eye irritation upon contact. *Id.*

[59]   Doc. 393 ¶¶ 43–44 (citing Doc. 286-2 at 1).

[60]   *Id.* ¶ 43.

[61]   *Id.* (internal quotation omitted).

[62]   *Id.* ¶ 44.

In response, Precision Drilling first reiterates that this exposure, given the varied approaches rigs take, would not be universal.[63] But the Company also emphasizes that the Employees "cite to no evidence in support of the proposition that Precision rigs regularly use the cited chemicals in drilling mud," or that "any plaintiff have ever been exposed to cited chemicals, [or] exposed in amounts in amounts that would result in the recited health hazards."[64] In sum, Precision Drilling contends that the Employees fail to show that they have even been exposed to these chemicals—to say nothing of chronic exposure that would result in reproductive toxicity, kidney damage, or the skin tumors observed in lab mice.[65] Indeed, some of the risks that the Employees highlight here—that FM Vert Mud/Slurry may cause "'gastrointestinal distress,' 'nervous system effects such as drowsiness, dizziness, headaches, nausea or blurred vision,'" or that it "may cause serious lung damage . . . if inhaled over long periods of time"—are simply not relevant when the PPE that they are seeking compensation for donning and doffing does not protect against the risk of ingesting or breathing in this chemical.[66]

## B.    The PPE

Given the many hazards of their workplace, the Employees wear PPE. Now, some of that gear is not at issue here because it is specialized PPE that is donned and

---

[63]   Doc. 401 ¶¶ 43–45; Doc. 392-2 ¶ 31.
[64]   *Id.*
[65]   *See id.*
[66]   Doc. 286-2 at 1.

doffed on the clock. For instance, during "'tripping pipe' operations . . . . the derrickhand works in an elevated monkeyboard and is harnessed with a 60 [foot] fall protection rope."[67] Likewise, when Employees are tasked with mixing chemicals in drilling mud, they are "normally required to wear rubber gloves and [a] rubber apron . . . , [and] may also wear a face shield and a respirator."[68] Similarly, if the Employees' particular task exposes them to significant drilling fluids they don and doff "disposable Tyvek suits or waterproof rain suits."[69]

But beyond this specialized PPE, Precision Drilling policy and Occupational Safety and Health Administration ("OSHA") rules require that during day-to-day operations workers wear basic PPE: steel-toed boots, hard hats, safety glasses, fire retardant coveralls, gloves, and earplugs.[70] Precision Drilling denies that donning and doffing this PPE is always done off the clock. Indeed, the Company highlights instances when the Employees may change during a safety meeting or changeover meeting; and it further notes that rig hands must only have their gloves and ear plugs with them when their shift begins.[71]

---

[67]   *Tyger I*, 308 F. Supp. 3d at 837.
[68]   Doc. 401 ¶ 29.
[69]   *Id.* ¶¶ 36, 38–39.
[70]   Doc. 401 ¶ 7 ("Defendants do not controvert that rig hands are required to wear a basic set of PPE ([fire retardant coveralls], steel-toed boots, hard hat, safety glasses, and sometimes ear plugs and gloves) when working on the drilling rig."); Doc. 395 at 12 ("The requirement to wear PPE flows out of OSHA's general industry regulations").
[71]   *See* Doc. 401 ¶ 5 (detailing how workers may sometimes change on the clock during safety meetings); Doc. 392-2 ¶ 26 ("Rig hands are not required to don ear plugs and gloves before their scheduled shift begins, but must have those items with them when working on the rig."). The Employees, however, deny that "pre-shift meetings were compensated before mid-2010." Doc. 404 ¶ 5; *see also id.* ¶ 14 ("It is admitted that the oncoming crew dons PPE prior to the

- 17 -

But two things are undisputed. First, the Employees are not always able to change on the clock.[72] And second, when the Employees cannot change on the clock, they spend additional uncompensated time walking back and forth between where they change and where they work.[73]

I previously summarized that this gear offers protection against "common hazards of the worksite, including (1) Chemicals, (2) Electric Shock, (3) Flying Debris, (4) Gases—pressurized and nonpressurized, (5) Dropped objects, (6) Overhead equipment, (7) Rotating equipment, (8) Slippery surfaces, (9) Suspended loads, and (10) Working at heights."[74] But given the scramble that has ensued over the bounds of this ten-item list, a bit more nuance is required.

### 1.    The Basic PPE's Protection Against Mechanical Risks

The Employees posit that their basic PPE offers them protection against the mechanical risks I identified earlier—that is, drop risks,[75] well cementing,[76] "pinches, burns, blisters, bruises, scratches, [and] abrasions,"[77] and "dust, falling objects, pieces of metal, flying debris, fire, and hearing loss."[78] To build their case,

---

onset of the first scheduled meeting of the day (when the pay day starts). By extension, Plaintiffs are not paid for the time donning PPE. It is denied that work actually commences at the beginning of the scheduled pay time; work commences beforehand because employees are required to arrive before the meeting so they can be fit for duty.").

[72]   Doc. 401 ¶¶ 5–6.
[73]   *See id.* ¶ 6.
[74]   *Tyger I*, 308 F. Supp. 3d at 837.
[75]   Doc. 393 ¶¶ 11–13.
[76]   *Id.* ¶ 14.
[77]   *Id.* ¶ 15.
[78]   *Id.* ¶ 16

the Employees again turn to the Precision Drilling Safety Manual and deposition testimony.

For instance, in discussing the risk that a tool may be dropped from a height, the Employees first point to the testimony of rig manager, who, in response to a question about what the Employees' PPE protects them from, stated, "[y]our hard hat [protects you from] somebody dropping something on your head. I mean, it's pretty straightforward, I think."[79] The Employees attempt to reinforce this testimony by citing the Precision Drilling Safety Manual.[80] But Precision Drilling counters that the page the Employees cite doesn't support their claim that "PPE protects against drop risks, which are potentially fatal."[81] As it turns out, the page the Employees cite includes only that "[t]ools dropped from a height have caused significant injuries, including fatalities."[82] Therefore, while this Safety Manual statements supports their second contention, that dropped tools may cause fatalities, it does not necessarily support their first, that PPE protects against this risk.[83]

The Employees also cite the Safety Manual in discussing the protection that PPE provides against cementing risks—this time without the trouble attendant to their claims about drop risks.[84] To start, the Safety Manual states, "[b]ecause

---

[79]   Doc. 242-14 at 29:15–17 (Deposition Testimony of Dale Schulte).
[80]   Doc. 393 ¶ 13.
[81]   *Id.*; *see* Doc. 401 ¶ 13.
[82]   Doc. 282-1 at 170.
[83]   *See id.*
[84]   Doc. 393 ¶ 14.

cementing is corrosive and can cause severe damage, all personnel must be properly dressed whenever the danger of contact exists."[85] As a result, "[t]he following protective equipment is essential: Safety Glasses[,] [g]loves that completely cover the wrist area[,] [b]oots that are fully laced[,] [and] [p]ant cuffs extending over the boots."[86] The Manual then instructs workers that if their "clothing becomes saturated during the cementing process," they should remove it, "shower or thoroughly wash affected skin areas," and "not wear the clothing until it has been washed."[87] On these claims, Precision Drilling responds only, "[t]he cited section . . . on necessary PPE states that it only applies when the danger of contact exists."[88]

Precision Drilling raises similarly few hackles over the Employees' claims drawn from deposition testimony that "safety glasses protect from 'pieces of metal or dirt,'"[89] and that "PPE also protects employees against other hazards in the working environment, such as dust, falling objects, pieces of metal, flying debris, fire, hearing loss, [and] abrasions."[90] The Company's reply only attempts to clarify

---

[85]   Doc. 283-1 at 1. The Employees cite to Doc. 282 for this proposition, *see* Doc. 393 ¶ 14. But the relevant statement is found in Doc. 283-1.

[86]   Doc. 283-1 at 1.

[87]   *Id.* (alteration omitted).

[88]   Doc. 401 ¶ 14.

[89]   Doc. 393 ¶ 11 (quoting Doc. 242-14 at 29:12–15 (Deposition Testimony of Dale Schulte)).

[90]   *Id.* ¶ 16 (citing to Doc. 242-14 at 29:14–17 and Doc. 242-13 at 22:1–11 (Deposition Testimony of Michael G. Adkins)). In response to a question from counsel, Michael Adkins replied that the basic PPE provides the following:

> The hard hat is going to protect the worker from, you know, equipment that may be overhead that could fall. The Safety glasses would protect the employee from flying debris. The coveralls protect the worker in the event of a fire. The steel-toed boots protect the worker in case tools or equipment is dropped and lands on

that "[t]he basic PPE protects against hazards and risks that exist in industrial workplaces and construction sites generally, not hazards and risks that are an intrinsic element of drilling oil and gas wells."[91] And the Company likewise does not contest that it "requires gloves to 'protect against possible pinches, burns, blisters, bruises, scratches[,] or abrasions.'"[92]

Finally, there is the protection that the basic PPE provides against the workplace accidents raised in the Employees reply brief.[93] Given that the rig hand survived the pin's impact, though he suffered "permanent disabling injuries," the Employees claim that it is "self-evident" the worker's hard hat "likely saved his life."[94] They make no claims, however, about the protection the basic PPE may have provided to the other two workers, one who died after being backed over by a frontloader and the other who died while performing a process called "tripping out."[95]

### 2.    The Basic PPE's Protection Against Fire and Burn Risks

The Employees' contention that their basic PPE protects them against fire and burn risks—from blowouts, the diesel fuel added to oil-based mud, and cementing—

---

their feet. Earplugs protect the worker from hearing loss. The gloves protect, obviously the fingers from the abrasion, the scratches, associated with doing work with their hands.

Doc. 242-13 at 22:1-11.

[91]    Doc. 401 ¶¶ 11, 16.

[92]    Doc. 393 ¶ 15; *see* Doc. 401 ¶ 15.

[93]    Doc. 403 at 8–11.

[94]    *Id.* at 9.

[95]    *See id.* 10–11.

centers on their fire retardant coveralls.[96] As one basis for this claim, the Employees look to an OSHA enforcement policy, quoting it for the proposition, "[f]lame retardant coveralls 'greatly improve[] the chance of a worker surviving and regaining quality of life after a flash fire. [Fire retardant coveralls] can significantly reduce both the extent and severity of burn injuries to the body.'"[97]

The other basis is, by now, familiar. The Employees' statement of facts also extensively cites deposition testimony, here of a Precision Drilling Safety Manager.[98] In the Employees' view, the Safety Manager's testimony supports their claim that "when working with hot liquids such as cement, covering your skin with coveralls is necessary [to] reduc[e] burn risks" and constitutes "an 'essential' aspect of Precision's safety protocol."[99] They pad their assertion about the fire retardant

---

[96] *See* Doc. 393 ¶¶ 17–22.

[97] Doc. 393 ¶ 18 (quoting OSHA Std. Interp. 1910.132, U.S. Dept. of Lab, Occupational Safety & Health Administration, *Enforcement Policy for Flame-Resistant Clothing in Oil and Gas Drilling, Well Servicing, and Production Related Operations*, 2010 WL 1149374, at *2 (Mar. 19, 2010). The Employees object to this OSHA statement on the grounds that "is not an undisputed fact, but a statement of OSHA position and so is hearsay." Doc. 401 ¶ 18. For the purposes of this motion, I have proceeded as if this statement would survive this hearsay challenge. *But see Provenzano v. RLS Logistics*, 2021 WL 1060439, at *10 (M.D. Pa. Mar. 18, 2021) (Mannion, J.) (quoting *Countryside Oil Co., Inc. v. Travelers Ins. Co.*, 928 F. Supp. 474, 482 (D. N.J. 1995), *Shelton University of Medicine & Dentistry of N.J.*, 223 F.3d 220, 223, n.2 (3d Cir. 2000), and *Damiano v. Scranton Sch. Dist.*, 2016 WL 3227254, at *3 (M.D. Pa. June 13, 2016)) ("It is well established that 'only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment.' This rule is particularly applicable to parties who attempt to rely upon hearsay statements to establish material issues of fact in order to preclude summary judgment. Regarding such claims, '[i]n this circuit, hearsay statements can be considered on a motion for summary judgment [only] if they are capable of admission at trial.' . . . 'It is not the burden of the court, but the plaintiff, to identify which hearsay exceptions apply.") (internal citations omitted).

[98] *See id.* ¶¶ 20–22; *see generally* Doc. 284-3 (Deposition Testimony of Lawson Threeton).

[99] Doc. 393 ¶¶ 20–21 (citing Doc. 284-3 at 59–61).

coveralls "essential" quality by emphasizing that the Safety Manager would not himself "do the job without fire retardant coveralls and clothing which fully covers the skin."[100] And they further highlight his statement that PPE is the "last line of defense" against hazards that cannot be engineered away.[101]

Precision Drilling, however, contends that these statements mischaracterize the Safety Manager's testimony.[102] The Company first notes that he did not say that it was "necessary," but rather that it was "safer."[103] On this front, I'll let the deposition speak for itself:

> Q.    Would you agree that [wearing fire retardant coveralls] is an essential component of the job if you're laying cement?
> A.    Are you saying that we couldn't do it without it?
> Q.    I'm asking if, under current—the way that—the products that are used to lay cement, if it's an essential component of safety.
> A.    Yes.
> Q.    So it could—it would be unsafe to it without—to lay cement without fire resistant clothing?
> A.    I would say it would be unsafer to do it with a short sleeve shirt on rather than [fire retardant] coveralls, yeah, but you could still do it either way. You don't have to have the coveralls on. It makes the job a little safer in case something spills on you, you know, if it's hot cement.
> Q.    You could potentially have—
> A.    No, it could prevent you getting burned as serious, something like that.
> Q.    So if you were personally doing it, you would want to wear those coveralls; right?
> A.    Yes, I would prefer to wear something long sleeved, definitely.
> Q.    Something that's fire retardant, correct, or resistant?

---

[100]   *Id.*

[101]   *Id.* The Employees also highlight that "Precision imposes a work-rule that coveralls may not be altered as alterations reduce the protection provided against fire and chemical burns." *Id.*

[102]   Doc. 401 ¶¶ 20–22.

[103]   *Id.*

A.    Yes.[104]

Precision Drilling also emphasizes that while the Safety Manger agreed that PPE was the "last line of defense," this was not to say the basic PPE protects against "all risks that cannot be eliminated" or that guarding against these risks—despite any incidental reduction in the risk of exposure the basic PPE provides—"is the reason why [it] must be worn."[105]

### 3.    The Basic PPE's Protection Against Exposure to Drilling Fluids and Hazardous Materials

The Employees proceed similarly in staking out their claim that their basic PPE protects them against drilling muds and other chemical hazards in their

---

[104]    Doc. 284-3 at 60:3–61:7 (Counsel for Precision Drilling's form objection to the first question is omitted here).

[105]    *See* Doc. 401 ¶¶ 20–22. The Safety Manager's testimony—for context:

> Q.    And you'd agree that part of the—an important element of target zero [accidents] would be wearing PPE, the appropriate PPE, at all times?
> A.    That's part of it.
> Q.    An important part of it?
> A.    In the way we look at safety, it's—kind of the last line of defense is PPE.
> Q.    It sounds—I'm sorry, it sounds important, but I just—I just want to make sure that I understand your testimony.
> A.    Well, PPE is, you know—let's say we have an incident that somebody— the first thing we look at is how can we engineer it out and keep the hazard from, you know, being there to an employee. Then we have our administrative side, which is our JSAs and COPs and our manuals. And then the last thing is our PPE. That's the—when we investigate workplace incidents, the first thing we do is look at engineering the issue out, or putting administrative controls, and the last thing would be like, let's just make everybody wear impact gloves.
> Q.    So it's the last line of defense?
> A.    Yes.
> Doc. 284-3 at 69:17–70:16.

workplace, relying once more on Material Safety Data Sheets, the Company Safety Manual, and deposition testimony.

To start, the Employees emphasize how the Safety Sheets "demonstrate that [the Employees] cannot work with chemical mud additives without PPE."[106] Although there is some variation, the Safety Sheets provide similar instructions.[107] To protect workers' eyes against exposure, the Sheets recommend wearing safety glasses (usually with the added specification that the glasses have side shields) or safety goggles; to protect workers' skin, the Sheets recommend clothing that will protect against repeated or prolonged skin contact and gloves (sometimes with the added specification that clothing be long-sleeved and chemical resistant).[108]

The Employees lodge a similar claim about the PPE's protection against oil-based mud containing diesel fuel.[109] They highlight that the Safety Sheet

---

[106]   Doc. 393 ¶ 28.
[107]   *See* Doc. 394-4 at 12–32.
[108]   *Id.* More specifically, the Sheets recommend:
- For Barite, "suitable protective gloves if risk of skin contact," "dust resistant safety goggles where there is danger of eye contact," and "appropriate clothing to prevent repeated or prolonged skin contact. *Id.* at 12.
- For FM WA II, "[s]afety glasses with side shields or chemicals goggles" and "[c]hemical resistant gloves and coveralls with long sleeves if potential for repeated skin contact exists." *Id.* at 15.
- For Lime, "[i]mpermeable" protective gloves, "dust resistant safety goggles where there is danger of eye contact. . . . [and a] face shield in case of splash risk," "appropriate clothing to prevent repeated or prolonged skin contact," and a "rubber apron." *Id.* at 16.
- For Geltone and MICA, "[n]ormal work gloves," "clothing appropriate for the work environment," and "safety glasses or goggles to protect against exposure." *Id.* at 22, 29.
- For FLR, the cited material cuts off before the section that describes the recommended PPE. *Id.* at 13.
[109]   Doc. 393 ¶ 36.

recommends that people working with diesel wear "[s]afety glasses equipped with side shields," "[c]hemical goggles . . . during transfer operations or when there is a likelihood of misting, splashing, or spraying," "heavy duty gloves constructed of chemical resistant materials," "long-sleeved fire-retardant garments while working with flammable and combustible liquids," and "[a]dditional chemical-resistant protective gear . . . if splashing or spraying conditions exist."[110]

What's more, as the Employees highlight, Precision Drilling's Safety Manual includes similar recommendations.[111] One page that the Employees cite to reiterates that "[c]hemical resistant gloves must be worn when handling or mixing caustic, acid[,] or other chemicals."[112] And it further provides:

> Proper clothing provides protection against, frostbite, sunburn[,] and chemical hazards which may be present at the work site. At PRECISION DRILLING OILFIELD SERVICES rig and shop facilities, it is strongly recommended that employees wear coveralls. At minimum, employees should wear long sleeve shirts and long pants or coveralls. . . . If employees are wearing shorts or cut-offs and/or a T-shirt, they must also wear coveralls.[113]

The Employees also turn to the Safety Manual to support one-half of their assertion, "PPE covers critical areas such as [the] skin, head, and eyes, and therefore PPE protects workers by effectively reducing the risk of skin and eye exposure to drilling fluids"—emphasizing the Manual's claims about eye protection.[114] Without

---

[110]   Doc. 394-4 at 18.
[111]   Doc. 393 ¶ 31.
[112]   Doc. 394-3 at 10.
[113]   *Id.* (emphasis omitted).
[114]   Doc. 393 ¶ 47.

specifying the purpose, the Safety Manual provides that workers must wear at least their basic safety glasses while on the rigs.[115] Though it's worth noting that the Manual also lists instances when heightened protection, such as safety goggles or a face shield are required. These scenarios include "[w]ear[ing] splash-proof chemical goggles when handling hazardous chemical liquids, powders, or vapors. . . . [when] cleaning with chemical solutions, handling chemicals in the mud tanks, or any operation that may expose the eyes to hazardous chemicals in liquid or solid form."[116]

To build out the other half of this assertion—that their PPE effectively reduces skin exposure—the Employees cull the testimony of various Precision Drilling workers.[117] The workers' testimony supports the Employees' claim that they are exposed to chemicals, which as I covered, have caused skin irritation.[118] But their claim that this testimony shows that the PPE does so *effectively* rests on shakier

---

[115] Doc. 282-1 at 77.

[116] *Id.* at 78. There is similarly a safety goggles requirement when moving chemicals. *Id.* at 77. And a full face shield is required when rig workers are "doing any work that produces flying flying particles or objects, such as chipping, scraping, buffing, grinding, hammering, and pressure washing." *Id.* (emphasis omitted).

[117] Doc. 393 ¶ 47.

[118] Doc. 242-9 at 48:5–49:1 (Deposition Testimony of Shayne Klepper) (Q. Okay. Does the— does the PPE get dirty when you're on the rig? A. Yes. Q. Okay. And what types of—when you say dirty—I know that's a word I just used. But how would you explain it? A. You get covered in dirt, grease, oil, mud, rain water. I mean, we work out in the elements; snow, ice. Q. Okay. You would agree that PPE can also get exposed to drilling fluid? A. Yes. Q. It can also get exposed to caustic chemicals? A. Yes. Q. How often does the PPE need to be cleaned. A. They're cleaned every tower, every day.); Doc. 242-10 at 77:1–7 (Deposition Testimony of Cody Neufeld) ("Q. Okay. But there's a—there's a—there's a range where you're not gonna change your coveralls immediately. A. Exactly. Q. But you still may come into contact with certain contaminants? A. Yes."); *see also* Doc. 242-16 at 24:14–25:16, 26:3–28:20 (Deposition Testimony of James Joyce).

ground. Just one cited worker's testimony touches on the topic—and he's far from conclusive:

> Q.    Okay. You understand that the crew members on the rigs can get exposed—when I say "exposed," I just mean that they may come into contact via their PPE with certain hazardous chemicals?
>
> A.    Yes.
>
> Q.    And is that one of the purposes of the PPE[,] to protect them from chemicals?
>
> A.    Yes.
>
> Q.    Some cause burning?
>
> A.    Yes, caustic.[119]

Though Precision Drilling haggles over various items—particularly whether Employees' citations support their claim—their primary point of disagreement with the Employees factual assertions is this: "The basic PPE . . . [is] not designed to protect rig hands from exposure to chemicals in [oil-based mud] or from the exposure of mixing in chemicals or additives such as caustic."[120] Rather, the PPE is designed to reduce the risk of hazards "present in industrial workplaces."[121] That, Precision Drilling argues, is why workers don respirators, face shields, and additional protective gloves when they mix hazardous chemicals. And it is also why they don additional garb when they are exposed to significant amounts of drilling mud.[122] Indeed, the same worker who affirmed that one of the purposes of PPE was to protect against chemical exposure later emphasized that when workers are

---

[119]   Doc. 242-9 at 45:4–19 (Deposition Testimony of Shayne Klepper).
[120]   Doc. 401 ¶ 29.
[121]   *Id.* ¶ 30.
[122]   *See id.* ¶¶ 34–39, 41–45.

exposed to greater amounts of drilling mud, they often don full Tyvek suits or

additional overalls.[123] This sentiment—that while the basic PPE has the incidental

effect of reducing exposure, it was not built to eliminate it—is also revealed in a line

of questioning raised by the Employees' counsel during a worker's deposition:

> Q.   So the coveralls doesn't protect you as a floorhand from drilling
>       mud, does it?
> A.   Yes, it keeps—it keeps it off your skin on most occasions.
> Q.   Okay. But it can soak through the coverall and get on your skin?
> A.   Yeah, if you—like I said if you get doused yeah.
> Q.   So you've had it on your skin?
> A.   Yes.[124]

## II.   PROCEDURAL HISTORY

This case's dense and contested factual background is perhaps only rivaled by

the peripatetic path it has traveled since its filing in 2011. Its pre-2018 wanderings,

which I detailed previously, are no longer of great import, so I will not dwell on

them here.[125] But the same cannot be said of its journey since. In short, this is not

the first time that I have considered whether Precision Drilling or the Employees are

---

[123]   Doc. 242-9 at 49:3–22 (Deposition Testimony of Shayne Klepper) ("A. So the way it works is you work your twelve hours. You might go through two pairs of coveralls. We also provide them throw-away Tyvek suits if you're doing a task that's going to really get you really covered in mud or the guys will wear them cleaning in the rig too just protect their coveralls. Them are throw-aways. So we just throw them away when we use them so that our coveralls don't get real dirty. Lots of guys wear rain bibs, overalls on top of their coveralls to protect themselves a little more from that. But, after your twelve hours is up, you would leave your coveralls in the change shack on the floor. The crew coming on tower would take them coveralls; wash them in a washing machine that Precision provides and dry them; fold them up and have them sitting there for when you come back to work.").

[124]   Doc. 335-4 at 61:5–62:3 (Deposition Testimony of Jeff McWilliams).

[125]   *See Tyger I*, 308 F. Supp. 3d at 834–35.

entitled to summary judgment on the donning and doffing question—and the case's post-2018 history and the bounds of the various rulings help determine the outcome.

My first donning and doffing decision came in April 2018, when I denied the parties' cross-motions for summary judgment.[126] At the time, I concluded that there was a genuine dispute of material fact about "the harmful nature of the drilling mud and other chemicals" involved in the Employees' "principal duties."[127] This determination had two key components. First, I settled on a test—adopting the approach taken by the United States Court of Appeals for the Second Circuit in *Perez v. City of New York* to assess whether PPE is "integral and indispensable.[128] That is, PPE is "integral and indispensable" when it "guards against 'workplace dangers' that accompany the employee's principal activity and 'transcend ordinary risks.'"[129] Second, I applied this test—finding that because the Employees' expert, Dr. Ronald Bishop, was prepared to testify about the potential health hazards posed by the chemicals involved in the drilling process, the Employees had enough evidence to proceed to trial.[130]

Yet as I noted in the decision, Dr. Bishop's expert report was hotly contested.[131] And a *Daubert* motion soon followed.[132]

---

[126]   *See id.* at 840–49.
[127]   *Id.* at 847.
[128]   *Id.* at 848; *see Perez*, 832 F.3d 120.
[129]   *Perez*, 832 F.3d at 127.
[130]   *Tyger I*, 308 F. Supp. 3d at 848.
[131]   *Id.* at 845.
[132]   *See Tyger v. Precision Drilling Corp.* (*Tyger II*), 2018 WL 8414745 (M.D. Pa. Dec. 18, 2018).

After determining that Dr. Bishop's opinion indeed lacked a factual foundation, I granted Precision Drilling's motion to exclude. While Dr. Bishop had sought to testify about how, among other things, the Employees' PPE would become contaminated with hazardous substances during the drilling process, his conclusions were untethered.[133] He had no data about the amount of hazardous material that the Employees were exposed to; he had no data about how much material accumulated on the Employees' PPE; and he had no data about how great an Employees' exposure would be if they encountered this soiled PPE.[134] In sum, his opinions were "nothing more than a hunch," as they just bootstrapped the existence of the chemicals on-site to Employee danger.[135]

Now, as I have previewed, Dr. Bishop's testimony was a key component of my earlier finding that the Employees had raised a genuine dispute about whether their PPE guarded against workplace dangers that accompanied their principal activities and transcended ordinary risks. So this result raised another important question: did removing this block send the entire tower crashing down? I therefore ordered the Employees to show cause as to why I shouldn't reconsider my earlier denial of Precision Drilling's motion for summary judgment.[136]

---

[133] *Id.* at *2.
[134] *Id.*
[135] *Id.*
[136] *Id.* at *3.

Ultimately, I determined that expert testimony was required to show that the Employees' basic PPE protected against chemicals that were in fact hazardous.[137] In reaching this finding, I likened the case to a toxic tort, where circuit precedent requires that plaintiffs provide expert testimony about their chemical exposure, in both type and amount, to advance past summary judgment.[138] So, in my view, because the Employees could only offer documentary evidence and lay testimony after Dr. Bishop's exclusion, Precision Drilling was entitled to summary judgment.[139]

The Employees appealed this decision, as well as my exclusion of Dr. Bishop's testimony and my denial of their motion for summary judgment.[140] The United States Court of Appeals for the Third Circuit took the appeal, affirming my decision to exclude Dr. Bishop's testimony and further determining that I had not erred in excising the Employees' claim that Precision Drilling had willfully violated the Fair Labor Standards Act.[141] The court nonetheless vacated my decision to grant summary judgment to Precision Drilling.[142] But in doing so, the panel did not take issue with my use of the Second Circuit's donning and doffing approach.[143] Rather,

---

[137] *Tyger v. Precision Drilling Corp.* (*Tyger III*), 2019 WL 6875731, at *2 (M.D. Pa. Dec. 17, 2019).

[138] *Id.* at *1.

[139] *Id.*

[140] *Tyger v. Precision Drilling Corp.* (*Tyger IV*), 832 Fed. Appx. 108, 109 (3d Cir. 2020).

[141] *Id.* at 112–13, 115.

[142] *Id.* at 113–15.

[143] *Id.* at 114 ("In evaluating whether the donning and doffing of PPE in this case qualified as integral and indispensable, the District Court adopted the inquiry set forth by the Second

they found I had erred in concluding that the Employees could not prove that their "work was sufficiently hazardous" without expert testimony.[144]

As the Third Circuit explained, "[u]nlike in the toxic tort context, the [Fair Labor Standards Act's] integral and indispensable inquiry does not require that Plaintiffs establish a causal link between occupational hazards and medical harm."[145] Therefore, while "expert testimony as to the levels of [the Employees'] chemical exposure would certainly support [their] case," it was not a necessary component of a Fair Labor Standards Act claim such that its absence would entitle the opposing party to summary judgment.[146]

But because in making this error I "never reached the issue of whether, based on the other evidence presented by [the Employees], donning and doffing the basic PPE was integral and indispensable to [their] work," the Third Circuit did not consider the question themselves. Instead, the panel remanded the case. And in doing so, they instructed me to consider, for the first time since the exclusion of Dr. Bishop's testimony, whether the lay testimony and documentary evidence that the Employees were prepared to offer would allow their claims to survive summary judgment.[147]

---

Circuit, mainly, whether 'the gear . . . guards against "workplace danger" that accompany the employer's principal activities and "transcend ordinary risk."'").

[144] *Id.* at 114.

[145] *Id.*

[146] *Id.* at 115.

[147] *Id.*

So with this background and the Third Circuit's mandate in mind, I'll again consider the parties' cross-motions for summary judgment.

## III.   SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[148] That this case includes cross-motions for summary judgment does not alter the calculus.[149] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[150] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[151] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[152]

---

[148]   Fed. R. Civ. P. 56(a).

[149]   *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008) (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)) ("Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.").

[150]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

[151]   *Clark*, 9 F.3d at 326.

[152]   *Id.*

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[153] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[154] The nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[155] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[156]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[157] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[158] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the

---

[153] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[154] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[155] *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

[156] *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (quoting *Childers v. Joseph*, 842 F.2d 689, 694–95 (3d Cir. 1988)).

[157] *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

[158] *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

motion."[159] Finally, although this Court "need consider only the cited materials, . . . it may consider other materials in the record."[160]

## IV.   ANALYSIS

Before analyzing whether the Employees have come forward with enough evidence for a reasonable factfinder to conclude that their basic PPE guards against workplace dangers that accompany their principal activities and transcend ordinary risks, I must first address a threshold claim. This claim centers on the scope of the Third Circuit's decision—which the Employees assert not only prevents this Court from entering summary judgment in Precision Drilling's favor but requires that they be granted summary judgment instead.

### A.     The Scope of the Third Circuit's Mandate

The Employees argue that in remanding this case, the Third Circuit went beyond merely reversing my finding that the case required "expert opinion on workplace safety risks or the protective value of their PPE in order to meet the integral and indispensable standard."[161] In their view, the court's decision resolved several factual issues, which they argue I am bound by here—even if untrue.[162]

---

[159]   Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613–14 (3d Cir. 2018).

[160]   Fed. R. Civ. P. 56(c)(3).

[161]   *Tyger IV*, 832 Fed. Appx. at 114; *see* Doc. 394 at 2–4; Doc 403 at 1–3; Doc 407 at 1, 3–8.

[162]   Doc. 407 at 6 ("[E]ven where a lower court fundamentally disagrees with the express language and findings made in an appellate mandate, it must dutifully comply *even where compliance* leads to results which the trial court finds *absurd* (which is clearly not the case at bar)."); *see also* Doc 403 at 2–3 (arguing the same).

Rather than dive right into the teeth of this claim, it's worth first summarizing the four factual issues the Employees claim the Third Circuit resolved.

Three of these claims are stated simply. To start, the Employees contend that I am bound by a statement in the background section: "basic PPE is worn to avoid common hazards at the worksite, such as electrical shock, falling objects, flying debris, slippery surfaces, and chemical exposure."[163] Second, they assert that I must also accept the Third Circuit "h[o]ld[ing] . . . as a matter of law" that "[i]t is undisputed that, in the course of rig hands' work drilling oil and gas wells, their basic PPE becomes covered with drilling mud, grease, lubricants, and caustic chemicals, and that the basic PPE reduces the risk of exposure to those substances."[164] And third, they contend that I am also bound by the Third Circuit's statement, "'[i]t is not disputed that Precision failed to pay for' donning and doffing PPE."[165]

Their remaining claim is more intensive. The Employees' seize on the Third Circuit's statement that under "both Precision's Policies and the relevant [OSHA] regulations, Plaintiffs are required to wear various forms of basic PPE while operating oil rigs," as well as the footnote that accompanies it.[166] That footnote, which cites 29 C.F.R. § 1010.132, includes the following explanatory parenthetical of the regulation: "mandating PPE 'wherever it is necessary by reason of hazards of

---

[163]   Doc. 403 at 3 (quoting *Tyger IV*, 832 Fed. Appx. at 110).
[164]   *See* Doc. 394 at 3 ("The Mandate held that, as a matter of law, the PPE 'reduces the risk of exposure to these substances'"); Doc. 403 at 3 (quoting *Tyger IV*, 832 Fed. Appx. at 110).
[165]   Doc. 403 at 3 (quoting *Tyger IV*, 832 Fed. Appx. at 110).
[166]   *Id.* at 2 (quoting *Tyger IV*, 832 Fed. Appx. at 110).

processes or environment, chemical hazards, radiological hazards, or mechanical irritants encountered in a manner capable of causing injury or impairment in the function of any part of the body through absorption, inhalation or physical contact.'"[167] From this set of statements, the Employees contend, "the Third Circuit explained [that] the regulation applicable to Defendants' worksite, 29 C.F.R. § 1910.132, requires employers to specifically analyze the given hazards on the jobsites and mandates PPE only when necessary to protect employees from those specific hazards."[168] And further, based on this finding (and the Employees' interpretation of the regulation's various subsections), "it is also indisputable that Precision [Drilling] assessed its workplace for actual and potential hazards and determined that the PPE was *necessary* in its workplaces because, *inter alia*, 'chemical hazards, radiological hazards, or mechanical hazards.'"[169]

Setting aside, for the moment, whether these statements reflect this case's record, I do not agree that I am bound by them. Under the mandate rule, when a case is remanded "for further proceedings after [a] decision by the appellate court, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal."[170] In determining the mandate's scope, "[a] trial court must

---

[167]   *Tyger IV*, 832 Fed. Appx. at 110, 110 n.3; *see* Doc. 403 at 2. *See generally* Doc. 394 at 3–4, 14, 16, 18; Doc. 407 at 12–13.

[168]   Doc. 394 at 16.

[169]   *Id.* at 18 (quoting 29 C.F.R. § 1910.132(a)).

[170]   *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3d Cir. 1985) (citing *Briggs v. Pennsylvania R.R. Co.*, 334 U.S. 304, 306 (1948)).

implement both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces."[171] At the same time, "the long-settled corollary" to this dictate is "that upon remand, [the trial court] may consider, as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision."[172] As a result, I am "free to make any order or direction in further progress of the case, not inconsistent with the decision of the appellate court, as to any question not settled by the decision."[173]

Put simply, the Third Circuit did not settle these factual matters. The statements, which are in the case's background section, were neither expressly nor implicitly decided when the court reversed my finding that expert testimony was required for the Employees to make out their case.[174] My ultimately erroneous decision was on a pure matter of law: no expert, no case. And so was the Third Circuit's reversal.

At worst, the Employees attempt to speak their claim into existence by labeling facts as holdings or dressing them up with the clause, "as a matter of law"; needless to say, this lipstick-on-a-pig approach won't do.[175] At best, the Employees can point to two sentences in the Third Circuit's decision that support their claim.

---

171   *Id.*
172   *Id.* (citing *Quern v. Jordan*, 440 U.S. 332, 347 n.18 (1979) and *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939)).
173   *Id.*
174   *See Tyger IV*, 832 Fed. Appx. at 113–15.
175   *See* Doc. 394 at 3–4.

First, in a footnote to the background section, the Employees emphasize that the court noted "[b]ecause we write primarily for the parties, who are familiar with the facts and procedural posture to date, we recite only the facts necessary to our analysis."[176] And second, the Employees stress the following sentence from the analysis: "We therefore conclude that a plaintiff may attempt to satisfy the integral and indispensable requirement with lay witness testimony and documentary evidence concerning worksite safety risks and the nature of the job and PPE at issue—evidence which Plaintiffs have produced in this case."[177] But at bottom, the Employees' conclusion is tough to square with the Third Circuit's statement that because I "never reached the issue of whether, based on the other evidence presented by the Plaintiffs, donning and doffing the basic PPE was integral and indispensable to Plaintiffs' work. . . . [it would] not address this question."[178] Indeed, reaching the Employees' stated end would require the Third Circuit to have decided which party made the more convincing case on certain disputed facts when it had chosen not to address the issue. I find that unlikely.

Yet while I disagree that I am bound by these statements, that is not to say they are wholly inaccurate. As I see it, most are wholly accurate. And if they are not wholly accurate, they are largely accurate, just lacking in nuance. The parties'

---

[176] *Tyger IV*, 832 Fed. Appx. at 110.
[177] *Id.* at 115.
[178] *Id.*

disagreement about the facts is really rather about their degree and the conclusions that they require.[179]

For instance, it is clear that OSHA regulations require that the Employees wear PPE, and I have no doubt that the Third Circuit has accurately stated what that regulation says.[180] The real dispute here is about the secondary and tertiary "facts" that the Employees claim are now "undisputed" as a result.[181] That is, the Employees' claim that Precision Drilling's admission on this front "conclusively establishes, not merely 'that there may be some degree of risk to employees;' rather . . . that 'at a minimum, [Plaintiffs] are exposed to a significant risk of harm' and that the PPE reduces such risk."[182] In other words, because the gear is OSHA-required, the integral and indispensable standard is satisfied and the Employees are entitled to summary judgment.[183] But I'll note here that my views on this matter have not changed since I rejected this argument in my first summary judgment decision, and there is no sign that the Third Circuit believes otherwise. To restate it simply, "the presence of an OSHA regulation requiring the instant PPE is relevant" to the

---

[179]   This disagreement is further evidence that the Third Circuit's background section was intended to situate readers, not drill down on factual disputes.

[180]   *Tyger IV*, 832 Fed. Appx. at 110, 110, n.3. Indeed, Precision Drilling acknowledges as much. Doc. 395 at 12 ("The requirement to wear PPE flows out of OSHA's general industry regulations").

[181]   *See* Doc. 401 ¶ 46.

[182]   Doc. 407 at 13 (alteration in the original).

[183]   *See* Doc. 394 at 15–20.

transcendent risk inquiry, but "it is not wholly determinative" as the Employees suggest.[184]

At the same time, the issue about the statement "'[i]t is not disputed that Precision failed to pay for' donning and doffing PPE" is that, depending on meeting scheduling, the Employees were *sometimes* able to don and doff on the clock.[185] But it remains clear that the Employees were not *always* paid. And it's a similar story with the Third Circuit's statement, "[i]t is undisputed that, in the course of rig hands' work drilling oil and gas wells, their basic PPE becomes covered with drilling mud, grease, lubricants, and caustic chemicals, and that the basic PPE reduces the risk of exposure to those substances."[186] Even if it is not an everyday occurrence, there is no doubt that some employees are exposed to these substances. Still, that is not to say, as I'll get into momentarily, that the Employees are exposed to hazardous amounts or that their basic PPE does much more than act as a barrier. Finally, in that same vein is the Third Circuit's statement that the "basic PPE is worn to avoid common hazards at the worksite, such as electrical shock, falling objects, flying debris, slippery surfaces, and chemical exposure."[187] The parties make differing claims about how significant and how common the risks are, as well as the amount

---

[184] *Tyger I*, 308 F. Supp. 3d at 844; *see Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 594 (2d Cir. 2007) ("The donning and doffing of generic protective gear is not rendered integral by being required by the employer or by government regulation.").

[185] Doc. 403 at 3 (quoting *Tyger IV*, 832 Fed. Appx. at 110); *see* Doc. 401 ¶ 5 (detailing that the Employees may sometimes change on the clock during safety meetings).

[186] Doc. 403 at 3 (quoting *Tyger IV*, 832 Fed. Appx. at 110).

[187] *Id.*

of protection that the basic PPE provides against them. So at day's end, this too is a matter of degree.

At first glance, the ink spilled over this issue would suggest that this suit has taken on a *Rashomon*-like quality. But on closer inspection, that is not the case. As I see it, the facts are clear. The real dispute is about the integral and indispensable legal standard and the results that these facts require.

And with that, I'll proceed to the merits.

## B.    The Transcendent Risk Inquiry under *Perez*

In remanding this case to consider whether "donning and doffing the basic PPE was integral and indispensable to [the Employees'] work," the Third Circuit did not reject my adoption of the Second Circuit's transcendent risk inquiry as it was set out in *Perez*.[188] So I see no reason to depart from it now. To show that donning and doffing their PPE is integral and indispensable to drilling oil and gas wells, the Employees must therefore prove that their basic PPE "guards against 'workplace dangers' that accompany [their] principal activities and 'transcend ordinary risks.'"[189]

The parties offer competing approaches to this inquiry. Precision Drilling's opening volley argues that this inquiry ought to begin and end with the generic nature of the Employees' basic PPE.[190] At the same time, the Employees urge that I take a

---

[188]   832 F.3d 120.
[189]   *Tyger I*, 308 F. Supp. at 848 (quoting *Perez*, 832 F.3d at 127).
[190]   Doc. 395 at 12.

page out of the statutory instruction playbook and look to the dictionary definition of each of the key words.[191] But neither is satisfactory.

To start, the first approach is flatly in conflict with the case from which the inquiry came. Let me explain: Precision Drilling claims that the workers' safety gear is generic, and that courts applying the recent Supreme Court case, *Integrity Staffing Solutions, v. Busk*, "have concluded that donning and doffing standard safety gear is not integral and indispensable to the principal work activity, including cases concerning the oil and gas industry."[192] And in support of this proposition, Precision Drilling cites *Gorman*,[193] and two other cases out of similar litigation in Texas, *Alanis v. Tracer Industry Management Co.*[194] and *Stanley v. Car-Ber Testing Texas, LLC*.[195]

But *Gorman* did not cite *Busk*—a time machine would have been required. And while the two Texas cases did, that still does not allow the Court to conclude that under the *Perez* transcendent risk inquiry generic gear can never qualify. The

---

[191]  Under their approach, a hazard would transcend ordinary risks when the "working environment . . . exposes employees to dangers which are beyond normal, such that 'an employee could not dispense with [donning his PPE] without impairing his ability to perform his principal activity safely and effectively.'" Doc. 403 at 5–6. Conveniently, this definition aligns with the integral and indispensable standard that they argue I ought to apply instead of *Perez*'s transcendent risk inquiry, that PPE is "integral and indispensable" when it "is utilized to guard against workplace risks which are not present in ordinary life." Doc. 394 at 3. But as the Employees concede, dictionary definitions are more typical in the realm of statutory construction. Doc. 403 at 5–6.

[192]  Doc. 395 at 12.

[193]  488 F.3d 586.

[194]  2016 WL 7551073 (E.D. Tex. Aug. 1, 2016), *report and recommendation adopted*, 2016 WL 4371535, at *2 (E.D. Tex. Aug. 16, 2016).

[195]  2015 WL 3980272 (E.D. Tex. June 29, 2015).

Texas cases relied on *Von Friewalde v. Boeing Aerospace Operations*,[196] a United States Court of Appeals for the Fifth Circuit case that cited *Gorman* for the proposition, "donning and doffing of generic protection gear such as safety glasses and hearing protection, are . . . 'noncompensable, preliminary tasks.'"[197] But if *Gorman* adopted a generic test, the Second Circuit walked it back in *Perez*.

The Employees' approach does little better, however. Besides subtly lowering the bar to a height which their case can clear, it adds definitions to an area of law that's already a word salad. Consider the long walk required to arrive at our present destination: the Portal-to-Portal Act created an exception for activities preliminary or postliminary to "principal activities," which Congress left undefined.[198] The Supreme Court then filled the void. It first defined "principal activities" as activities that "are an integral and indispensable part of the principal activities for which covered workman are employed."[199] And it later clarified that "integral and indispensable" is something that "is an intrinsic element of these [principal] activities and one with which the employee cannot dispense if he is to perform his principal activities."[200] From there, needing to focus this inquiry given the wide contexts in which it is applied, the Second Circuit—in an approach this Court elected to follow—determined that donning and doffing PPE is integral and indispensable

---

[196]  339 Fed. Appx. 448, 454 (5th Cir. 2009).
[197]  *See Alanis*, 2016 WL 7551073, at *6–7.
[198]  *See* 29 U.S.C. § 254(a).
[199]  *Steiner*, 350 U.S. at 256.
[200]  *Integrity Staffing Solution, Inc. v. Busk*, 574 U.S. 27, 33 (2014).

to workers' principal activities when it "guards against 'workplace dangers' that accompany [their] principal activities and 'transcend ordinary risks.'"[201]

If, as the Employees wish, this Court were to add yet another set of definitions to arrive at "dangers which are beyond normal," (and to further tack on language from Justice Sotomayor's concurrence: "such that 'an employee could not . . . perform his principal activity safely and effectively'") would this Court not then need to define "dangers," "normal," "safely," and "effectively" as well? That way lies madness.

Given these shortcomings, to divine the inquiry's bounds, I will instead look to *Perez* and the line of three cases that Second Circuit drew it from:[202] *Steiner v. Mitchell*,[203] *Alvarez v. IBP, Inc.*,[204] and *Gorman v. Consolidated Energy Corp.*[205]

The seminal case in the integral and indispensable PPE jurisprudence is *Steiner*, a 1956 Supreme Court case that dealt with the compensability of post-work showers and the donning and doffing of company-provided clothing.[206] There, the change-and-shower program was necessitated by the circumstances.[207] Though the Court also noted that employees' work at a battery plant included "extensive use of dangerously caustic and toxic materials," its decision centered on the workers'

---

[201] *Perez*, 832 F.3d at 127 (quoting *Gorman*, 488 F.3d at 593).
[202] *Id.* at 124–25.
[203] 350 U.S. 247.
[204] 339 F.3d 894 (9th Cir. 2003).
[205] 488 F.3d 586.
[206] *Steiner*, 350 U.S. at 249–51.
[207] *Id.* at 248.

endemic daily lead exposure.[208] Despite its best efforts, the plant could not keep employees' lead exposure below 1.5 milligrams per 10 cubic meters, the level scientists then regarded as hazardous because of the risk of lead poisoning.[209] But in detailing lead's hazards and the benefits of changing and showering, the Court hit on several facts beyond the recorded lead levels.

For instance, the decision noted that medical exams revealed that some workers had "[a]bnormal concentrations of lead" in their bodies; and it further highlighted evidence that by merely bringing particles home workers exposed their families to danger.[210] Likewise the Court noted factors beyond this physical evidence—describing how state law required the company to provide shower facilities and pointing out how insurers would not provide the employer required coverage without these facilities.[211] Finally, the Court stressed testimony from a company employee stating, "[i]n the afternoon the men are required by the company to take a bath because lead oxide might be absorbed into the blood stream. It protects the company and the employee both."[212] In combination, the Court found that these facts rendered the changing of clothes and showering "an integral and indispensable part of principal activities for which [they were] employed . . . ."[213]

---

[208]   *Id.* at 249–50.
[209]   *Id.* at 249.
[210]   *Id.* at 250.
[211]   *Id.* at 250–51.
[212]   *Id.* at 251 (internal quotation omitted).
[213]   *Id.* at 256.

Next in the chronology is *Alvarez*.[214] There, the United States Court of Appeals for the Ninth Circuit considered whether meat plant workers should have been paid to don and doff their protective gear.[215] At the outset, the court noted the danger faced by meat plant workers, writing, "[a]ccording to the United States Department of Labor's Bureau of Labor Statistics, employment at a packing plant is still one of the most dangerous jobs in America, with multiple thousands of workers injured on the job every year."[216] Indeed, the trial court had found that workers could be injured if their knife slipped on built up fat and blood while butchering.[217] As a result, workers wore protective gear, which spanned the spectrum from "non-

---

[214]   339 F.3d 894. Ultimately, *Alvarez* was appealed to the Supreme Court; however, neither the Ninth Circuit's conclusion that the unique and non-unique gear was integral and indispensable, nor its finding that only the unique gear was compensable because the time spent donning and doffing the non-unique gear was *de minimis* were challenged. *Alvarez*, 546 U.S. at 32 ("IBP does not challenge the holding below that, in light of *Steiner*, the donning and doffing of unique protective gear are 'principal activities' under § 4 of the Portal-to-Portal Act. Moreover, IBP has not asked us to overrule *Steiner*. . . . Thus, the only question for us to decide is whether the Court of Appeals correctly rejected IBP's contention that the walking between the locker rooms and the production areas is excluded from FLSA coverage by § 4(a)(1) of the Portal-to-Portal Act.").

[215]   *Alvarez*, 339 F.3d at 902–03.

[216]   *Id.* at 898 (citing U.S. Dept. of Labor, Bureau of Labor Statistics, *Industry Injury and Illness Data* (2002), http://www.bls.gov/iif/oshum.htm).

[217]   *See Alvarez v. IBP, Inc.*, 2001 WL 34897841, at *13 (E.D. Wa. Sept. 14, 2001) ("The workers testified that they could not hold the knives safely without the clean gloves because of the blood and fat that made them slip. Many workers changed their gloves multiple times a day in order to keep them clean. Some had as many as six to eight pairs that they changed throughout the day. In addition to safety concerns, the employees testified that the gloves were necessary as insulation from the cold of the refrigerated carcasses and the cold temperature of the processing floor. Cold hands made it more dangerous to use knives, saws, and other types of cutting equipment."). Given, however, that the Ninth Circuit's integral and indispensable test then focused on whether the company or OSHA rules required the gear—which, as I'll get into momentarily, the Supreme Court has since rejected—the hazards in this case did not take center stage.

unique" items, like hairnets and hard hats, to "unique" gear, like Kevlar gloves and metal-mesh leggings.[218]

Ultimately, the Ninth Circuit rejected the workers' non-unique gear claims. The court wrote, "neither the [Fair Labor Standards Act] policy nor 'the actualities of plaintiffs' working conditions justif[ied] compensation for the time spent performing these tasks."[219] So it determined that putting on hard hats and hair nets was noncompensable under the *de minimis* doctrine—a dagger that still dangles over this case.[220] But in the process, the Ninth Circuit also determined that the donning and doffing of unique and non-unique gear alike was "integral and indispensable."[221] It reached this finding after determining first that OSHA and company rules *required* this gear to be worn and then finding "that donning, doffing, washing, and retrieving protective gear [was], at both broad and basic levels, *done for the benefit of* [*the employer*]."[222]

---

[218]  *Alvarez*, 339 F.3d at 904.

[219]  *Id.* at 903.

[220]  *Id.* The *de minimis* doctrine stems from *Anderson*, 328 U.S. at 692 ("When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved."). The basic PPE at issue in this case would seem to be a candidate for dismissal under this doctrine. But this issue has not been extensively briefed. *See* Doc. 400 at 33–34; Doc. 407 at 14–17. And the Employees have also highlighted deposition testimony claiming that it took up to 45 minutes to don and doff the gear. *See* Doc. 242-17 at 102 (Deposition Testimony of Rodney Tyger).

[221]  *Alvarez*, 339 F.3d at 904.

[222]  *Id.* (emphasis added)

But there is good reason to divorce this required-by and for-the-benefit-of-the-employer analysis from any assessment under the *Perez* inquiry. Over a decade later, in *Busk*,[223] the Supreme Court explicitly rejected both prongs of this Ninth Circuit test when it considered the compensability of post-shift security screenings.[224] The Court wrote, "[t]he Court of Appeals erred by focusing on whether an employer *required* a particular activity," and it later added, "[a] test that turns on whether the activity is for the benefit of the employer is similarly overbroad."[225]

The lessons that can be drawn from *Perez*'s nodding approval of *Alvarez* are accordingly limited. As I see it, *Perez* can be read only to endorse the end-result. That is, in the Second Circuit's view, the donning of non-unique garb, like the Kevlar gloves and metal-mesh leggings that survived the Ninth Circuit's *de minimis* assessment, guarded against workplace dangers that accompanied the butcher's principal activity and transcended ordinary risks. And indeed, this sort of gear is the only type mentioned in the Second Circuit's decision. In support of its initial proposition—that "[c]ourts have . . . concluded that an employee's pre- and post-shift efforts to protect against heightened workplace dangers can qualify as integral and indispensable"—the court wrote just that "in *Alvarez*, the Ninth Circuit concluded that slaughterhouse employees' donning and doffing of protective

---

[223]   574 U.S. 27.
[224]   *See id.* at 36.
[225]   *Id.* (emphasis in the original).

equipment, including 'metal-mesh gear,' qualified as integral and indispensable to their butchering work."[226]

Next in the sequence is *Gorman*, a 2007 case in which the Second Circuit considered compensability claims brought by Indian Point Nuclear Power Plant workers.[227] Part of the workers' case centered on unpaid time spent donning and doffing helmets, safety glasses, and steel-toed boots.[228] After highlighting the dangerous work conditions faced by the workers in *Steiner*, the lower court had concluded, without exploring any dangers intrinsic to work at Indian Point, that the gear was "not specialized" because "[a]nyone could purchase them at an ordinary hardware store."[229] In the court's view, this made the PPE unlike the clothes worn in *Steiner* or the meat-processing plant equipment in *Alvarez*.[230] And in any event, the trial court further added that the time spent donning and doffing the gear was *de minimis*, rendering it otherwise noncompensable.[231]

The Second Circuit affirmed the motion to dismiss on appeal. In the appellate court's view, "[t]he donning and doffing of such generic protective gear [was] not different in kind from 'changing clothes and showering under normal conditions,'

---

[226] *Perez*, 832 F.3d at 124–25.
[227] *Gorman*, 488 F.3d at 589.
[228] *Id.* at 594.
[229] *Id.*
[230] *Gorman v. Energy Nuclear Operations, Inc.*, 2006 WL 477619, at *5, *5 n.9 (S.D.N.Y. Apr. 14, 2006).
[231] *Id.*

which, under *Steiner*, [were] not covered by the [Fair Labor Standards Act]."[232] At the same time, the court also emphasized, "[t]he donning and doffing of generic protective gear [was] not rendered integral by being required by the employer or by regulation."[233]

But it would be a mistake to read *Gorman* without *Perez*'s gloss.[234] In *Perez*, the Second Circuit reversed a trial court that found the donning and doffing of bulletproof vests by urban park rangers noncompensable based solely on its generic nature. This error, according to the court, stemmed from the trial court's misapplication of *Gorman*, which it took to mean "the donning and doffing of generic protective gear is not covered by the [Fair Labor Standards Act]."[235] But the Second Circuit emphasized that *Gorman* did not establish a categorical genericity rule.[236] Rather, in its view *Gorman* had "held that nuclear power plant employees' donning and doffing of helmets, safety glasses, and steel-toed boots did not qualify as integral and indispensable because the items at issue guarded against only routine workplace risks." What's more, the Second Circuit emphasized, while "[t]he generic nature of the items may have pointed toward that ultimate conclusion, because

---

[232]   *Gorman*, 488 F.3d at 594.

[233]   *Id.* (citing *Reich v. IBP, Inc.*, 38 F.3d 1123, 1126 (10th Cir. 1994)).

[234]   *See Tyger I*, 308 F. Supp. 3d at 846–47 ("I must recognize first that Gorman presents a rather narrow view of the compensability of generic PPE. Indeed, beyond the treatment rendered by the Second Circuit when it revisited the issue in *Perez*, I note that other courts have cautioned against its broad application.").

[235]   *Perez v. City of New York*, 2015 WL 424394, at *2 (S.D.N.Y. Jan. 15, 2015) (quoting *Gorman*, 488 F.3d at 594) (internal alterations omitted).

[236]   *Perez*, 832 F.3d at 127.

generic equipment is more likely than specialized equipment to address workplace conditions that are commonplace. . . . [,] the items' generic nature did not *establish*, as a matter of law, that they guarded against only routine risks."[237] The Second Circuit drew on *Steiner* for this point, which it emphasized held, "items as generic as a shower and a change of clothes can, in certain circumstances, neutralize extreme threats to worker safety."[238] As a result, "[t]o decide whether the use of protective gear qualifies as integral and indispensable, therefore, courts always must determine whether the gear—however generic or specialized—guards against 'workplace dangers' that accompany the employee's principal activities and 'transcend ordinary risks.'"[239] And "[t]his inquiry," the court further noted, "requires a fact-intensive examination of the gear at issue, the employee's principal activities, and the relationship between them."[240]

With this clarified standard in mind, the Second Circuit determined that "[t]he risk of sustaining gunfire while enforcing municipal laws [was] not, in [their] view, an ordinary risk of employment,"[241] and remanded the case to the district court to determine whether the donning and doffing of "the bulletproof vest also may qualify as integral and indispensable."[242]

---

[237] *Id.*
[238] *Id.*
[239] *Id.*
[240] *Id.*
[241] *Id.* at 125.
[242] *Id.*

So where does that leave us? Ultimately, the *Perez* inquiry "is markedly 'fact-dependent,'" but as I see it, these four cases bear on the three components baked into phrase "guards against 'workplace dangers' that accompany the employee's principal activities and 'transcend ordinary risks.'"[243]

First, the Employees must identify a workplace danger that transcends ordinary risks. The cases make plain that courts should not concern themselves with trifles. *Perez* and *Steiner* centered on deadly harms. But by acknowledging *Alvarez*, where the workers' PPE guarded against the risk of slicing themselves while butchering meat, *Perez* appears to have left the door open to serious, though not necessarily lethal, harms.[244]

Second, the Employees must show that this transcendent risk accompanies their principal activities. If the inquiry's first step centers on the magnitude of the risk, the second centers on its frequency. In *Steiner*, the risk was pervasive; each day the workers entered the plant they were exposed to dangerous levels of lead.[245] But this appears to represent just one end of the spectrum, as *Perez* recognized that the less common risk of line-of-duty shootings may suffice.[246]

---

[243] *Tyger I*, 308 F. Supp. at 848 (quoting *Perez*, 832 F.3d at 127).

[244] *See Perez*, 832 F.3d at 125.

[245] *See Steiner*, 350 U.S. at 249–51.

[246] *See Perez*, 832 F.3d at 125, 127 (noting that "[t]he risk of sustaining gunfire while enforcing municipal laws [was] not, in [its] view, an ordinary risk of employment," and later determining that "[b]ecause the success of . . . [this] argument[] is fact-dependent, [the circuit court would] leave it to the district court, on remand, to address [it] in the first instance.").

Third, the Employees must show that their basic PPE "guards against" this transcendent risk. Here, the Employees have a tough row to hoe. One case, *Gorman*, more-or-less states outright that basic PPE is not up to the task when the risk is sufficiently great.[247] And while I have noted that the blind application of *Gorman* is unwarranted, two of the other cases, *Alvarez* and *Perez*, hint at that same conclusion.[248] Regardless, *Perez* rejects a categorical approach, and instructs that "a fact-intensive examination of the gear at issue" be undertaken. As I view it, the gear must provide meaningful protection. Though *Perez* spoke of gear "neutraliz[ing] extreme threats to worker safety," it did not seem to think absolute protection was required; a bulletproof vest may well prevent an officer from being shot in the mid-section, but that's about it.[249] As a result, even when there is no other evidence of a particular item's effectiveness, it may suffice that it was intended to protect against a particular harm.

So how then does this inquiry apply to the risks and PPE that the Employees identify here?

### 1.    Mechanical Risks

For the most part, the mechanical risks that the Employees describe are quintessentially ordinary. Having your hand pinched, burned, or blistered is undoubtedly uncomfortable; and the same could be said about having your eyes

---

[247]   *Gorman*, 488 F.3d at 594.
[248]   *See Perez*, 832 F.3d at 127; *Alvarez*, 339 F.3d at 904.
[249]   *Perez*, 832 F.3d at 127.

exposed to debris and dust or even having your toes crushed.[250] Although risks need not be fatal, the Employees have not shown that these are persistent or severe enough to be said to transcend ordinary risks. To hold otherwise would require lowering the bar further than any other court has to date. And this Court will not be breaking that new ground.

Some of these same faults are present in the Employees' claims that other aspects of their day-to-day operations have had harmful, and at times deadly, or near deadly, consequences. Let's start with the Employees claims that they may suffer hearing loss from workplace noise and that "cementing . . . 'can cause severe damage.'"[251] As best I can gather from their various filings, to support the first of these assertions, the Employees cite the Company Safety Manual, which they claim says, "[n]oise induced hearing loss is irreversible . . . [and] PREVENTABLE,"[252] and deposition testimony where a rig worker stated, "I'm deaf because I didn't wear [ear protection] because it wasn't a rule."[253]

---

[250]   Doc. 393 ¶¶ 11, 15–16.

[251]   *See* Doc. 393 ¶¶ 14, 16; *see also* Doc. 403 at 7 (pointing to the Precision Drilling Safety Manual in support of their hearing loss claim).

[252]   *See* Doc. 403 at 7. And I say they *claim* because the citation they provide does not actually direct the Court to a page. The Employees cite Doc. 282, but the Bates number they provide, "8475," isn't included in that document or Doc. 283, which contains the second half of the safety manual.

[253]   Doc. 242-14 at 29:21–22; *see* Doc. 404 ¶ 43. The Employees also cite to deposition testimony emphasizing that earplugs protect against the risk of hearing loss. *See* Doc. 393 ¶ 16; Doc. 242 at 22:8–9 (Deposition Testimony of Michael Adkins) ("Earplugs protect workers from hearing loss.").

But a reasonable juror could not conclude that the Employees faced a transcendent risk. Quite simply, the Employees have not shown that the risk of hearing loss is hazardous enough. Indeed, what evidence they do have comes from one individual who made an off-hand remark about being deaf—though given that he sat for a deposition, this appears not to have been total. At the same, nothing suggests that this experience was commonplace.[254] Now, had the Employees uncovered evidence that workers across-the-board experienced deafness, that may well have catapulted this non-deadly risk to *Steiner*-, *Alvarez*-, and *Perez*-like levels. As is, however, the evidence falls well short.

The second of these assertions, about the risk of cementing, suffers similar evidentiary flaws. The sole basis for the Employees' claim is the Company Safety Manual. It instructs rig workers, "cementing is corrosive and can cause severe damage," and thus "all personnel must be properly dressed whenever the danger of contact exists"—with proper dress meaning "safety glasses, gloves that completely cover the wrist area, boots that are fully laced, [and] pant cuffs extending over the boots."[255] What's more, the Safety Manual provides that if the rig workers' clothing becomes saturated, they are to remove it and wash their skin."[256] But none of the Employees' briefs, nor their answer to Precision Drilling's statement of facts, shed

---

[254] *See* Doc. 242-14 at 29:21–22.
[255] Doc. 393 ¶ 14 (quoting Doc. 283-1 at 1).
[256] *Id.*

any more light on this risk, or what "cementing" even entails.[257] "Severe damage," if supported and explicated, may well be a transcendent risk. But based on the evidence that the Employees have put forward here, there's no way of knowing. As it stands, a jury would not even have enough evidence to begin weighing the magnitude or frequency of risk posed by the cementing process—to say nothing of concluding that it was a transcendent risk.

Finally, there are the three workplace accidents that the Employees raised in their reply brief.[258] Precision Drilling contends that these reply brief attachments cannot be considered at summary judgment; that may well be, but even if they were, it wouldn't move the needle.[259] To start, the three workplace accidents are unrelated and infrequent.[260] In one, a pin fell 80 feet, embedding itself in a rig worker's

---

[257] *See* Doc. 394; Doc. 403; Doc. 407; Doc. 404.

[258] Doc. 393 ¶ 13; *see* Doc. 403 at 11.

[259] That I am setting aside this objection in no way means that I reject Precision Drilling's claim, which is based on the Employees' counsel, the affiant, not being a proper source to introduce these documents through at trial. Doc. 406 at 8–9. At a glance, this objection appears well-founded. *See Travelers Ins. Co.*, 928 F. Supp. at 482 (citing Fed. R. Civ. P. 56(e) and *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 471 (3d Cir. 1989)) (quoting Fed. R. Evid. (901(a) and 10A Charles A. Wright et. al, Federal Practice and Procedure § 2722 at 58–60 (2d ed. 1983)) ("It is well settled that only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment. A decision on admissibility under Rule 56 is governed by the same standards at trial. Federal Rule of Evidence 901(a) requires 'authentication or identification as a condition precedent to admissibility.'. . . In order for a document to be considered by a court in ruling on a motion for summary judgment, . . . 'the affiant must be a person through who the exhibits could be admitted into evidence.'") (internal citations omitted).

[260] Precision Drilling has emphasized, "[t]he basic PPE protects against hazards and risks that exist in industrial workplaces and construction sites generally, not hazards and risks that are an intrinsic element of drilling oil and gas wells." Doc. 401 ¶¶ 11, 16. As I see it, it's not about whether the risk is a direct result of oil- or gas-drilling operations, but rather about how harmful and commonplace that event is. Thus, the risk that a tool falls and strikes an employee

helmet—backing the Safety Manual's assertion that "tools dropped from a height have caused significant injuries."[261] In another, a rig worker was killed when he was backed over by a frontloader.[262] And in the final example, a rig worker was killed while "tripping out."[263] But while the magnitude of harm in each instance is great, causing death or near-death, these accidents appear to happen once a decade—if that. And that frequency is a far cry from the daily exposure in *Steiner* or the not uncommon line-of-duty shooting that the Second Circuit dealt with in *Perez*.[264] If these isolated incidents did qualify, it would make the requirement that the hazard "accompany the employee's principal activities" meaningless.

Furthermore, for two of these instances, there's no evidence suggesting that the basic PPE did anything to guard against the risk. I disagree with Precision Drilling's claim that it would be improper to assume that the rig worker whose helmet was impaled by a pin would have suffered greater injury had he not been wearing the hard hat.[265] If that doesn't suffice, I don't know what would. But that's

---

could not be discounted as extrinsic to drilling operations merely because it happens elsewhere.

[261] Doc. 403 at 9–10; Doc. 282-1 at 170.

[262] Doc. 403 at 11.

[263] *Id.*

[264] As the issue was remanded for consideration in the first instance in *Perez*, neither the district or circuit court delved into how often these law enforcement officers were shot; however, according to FBI data, 22,088 officers were injured in assaults with firearms between 2010 and 2019. FBI, Uniform Crime Reporting: Law Enforcement Officers Killed and Assault, Table 85 (2019), https://ucr.fbi.gov/leoka/2019/topic-pages/tables/table-85.xls. There are undoubtedly more law enforcement officers in the country than oil rig workers, and urban park rangers may well face a lesser risk, but in the Court's view, these appear to be quite different likelihoods of harm.

[265] *See* Doc. 406 at 9–10.

not necessarily the case for the other two. Indeed, the Employees never even make the case that their basic PPE provided any protection against these risks. That's telling. As I see it, a reasonable jury could not conclude based on the evidence before the Court that any gear, whether basic or specialized, would have protected the now-deceased rig workers.

### 2.   Fire and Burn Risks

The fire and burn risks pose a closer call, but some of the same problems persist. The Employees compile a strong case that their fire retardant coveralls guard against the risk of fires and burns. Between an OSHA enforcement policy statement that emphasizes this gear's protection, deposition testimony highlighting that it reduces burn risk, and—perhaps most importantly—the fact that fire retardant coveralls were meant to do just that, a reasonable jury could easily find that this gear guards against fire and burn risks.[266] The Employees fail, however, to offer evidence on the severity and frequency of these supposed risks.

The crux of their claim, which is based on the Company's Safety Sheets and Safety Manual, is that their worksite poses a risk of flash fires and blowouts. At first blush, these risks appear serious, even deadly. But the Employees fail to show that these risks are more than hypothetical—a problem that may well be inherent in cases built on safety manuals. At best, they can point to Glenn Hoganson's statement that

---

[266]   *See* Doc. 393 ¶ 18 (detailing the OSHA policy); *id.* ¶ 20–22 (describing deposition testimony).

he knew of a rig catching fire.[267] But this isolated incident, which does not appear to have even taken place on a Precision Drilling rig, is not enough to drag their claim over the finish line.[268] Put simply, without evidence showing the likelihood of this harm, these risks are far too different from *Steiner* and *Perez* for a reasonable juror to find that they accompany the Employees' principal activities and transcend ordinary risks.

The same goes for the Employees' ancillary claim centering, once again, on the cementing process. They contend that rig hands may experience burns during this process; yet nothing they cite clarifies the likelihood or magnitude of this harm. Indeed, in the words of the Safety Manager, whose deposition the Employees rely on, the evidence they've put forward merely shows that cementing without fire retardant coveralls would be "unsafer."[269] That is not enough to survive summary judgment.

---

[267]   *See* Doc. 242-20 at 41–42.

[268]   *See id.* at 41:12–42:3 (Deposition Testimony of Glenn Hoganson) ("Q. Have you ever seen a fire on a rig? A. Yes, I have. Q. And have you ever seen a fire get close to a guy who is wearing a coverall? A. No. We evacuated the rig and the company men, but I have personal knowledge of the crew that—the drilling that took my job when I left cyclone [and] went to work for Precision. Rig 18 caught on fire. The driller, the motor hand[,] and the floor hand were burned 90 percent of their bodies. It almost killed both of them. They spent over two years in the hospital. The rig burned to the ground. The derrick went over in two and a half minutes. Okay. These are—those two cats I've known my whole adult life since I was in my twenties.").

[269]   *See* Doc. 284-3 at 60:3–61:7 (Deposition Testimony of Lawson Threeton); Doc. 393 ¶ 20.

### 3. Chemical Risks

Finally, the chemicals risks that the Employees have identified fare similarly. As I see it, the evidence more than adequately shows that they were exposed drilling fluid on a frequent enough basis, contrary to Precision Drilling's claim that the lack of uniformity in drilling mud type and exposure rendered it too unlike *Steiner*.[270] Indeed, everyday exposure is not required: *Perez* permitted a claim to move forward even though line-of-duty shootings do not happen daily.[271] The problem, however, is that the Employees' evidence fails to show that the drilling mud endangered them. In *Steiner*, the record was clear. The workers were regularly exposed to lead concentrations exceeding 1.5 milligrams per 10 cubic meters; medical professionals had determined that this level of exposure caused lead poisoning; and in medical exams, workers had in fact registered excessive lead levels.[272] At the same time, in *Perez*, the risk that police officer may be shot was considered more-or-less self-evident—though the Second Circuit ultimately remanded the case to the trial court for consideration of these dangers in the first instance.[273] But here, the Employees' evidence consists of a Company Safety Manual and Material Safety Data Sheets

---

[270] *See* Doc. 395 at 20 ("Exposure to oil-based mud is not a uniform condition of employment. It is undisputed that not all rigs drill using oil-based mud. Those that do use it do not use it exclusively, and the percentage of the time they do use it varies. . . . As a result, it cannot be said that exposure to oil-based mud is a consistent hazard similar to the uniformly present hazard of lead poising in *Steiner*.").

[271] *See Perez*, 832 F.3d at 125, 127.

[272] *Steiner*, 350 U.S. at 249–50.

[273] *See Perez*, 832 F.3d at 125.

suggesting that these chemicals "may" or "can" cause various health effects and deposition testimony showing that drilling mud caused some workers rashes and infections.[274]

In its reversal, the Third Circuit made plain that expert testimony is not required to make out these claims because the "integral and indispensable inquiry does not require that Plaintiffs establish a causal link between occupational hazards and medical."[275] But that does not alleviate the Employees of their burden entirely. Their lay and documentary testimony must still show that the hazard transcended ordinary risks. And at bottom, it is not enough for the Employees to flail at cancer risks that are only evident in lab mice, or which only come through ingesting or breathing in the chemicals.[276] So based on this evidence, I do not believe that a reasonable jury member could conclude that exposure to drilling mud in their day-to-day operations posed a transcendent risk. The Employees have not shown that any of the prerequisites to the "may" or "can" have been met—at most, they have highlighted few instances of irritated hands.

Still that is not the only problem with their evidence. Even if the Employees could show that they were exposed to dangerous amount of drilling fluid, I remain unconvinced that the basic PPE, and in particular their fire retardant coveralls, adequately guard against this risk. It is undeniable that by being a barrier, the basic

---

[274]   *See* Doc. 401 ¶¶ 43–45.
[275]   *Tyger IV*, 832 Fed. Appx. at 114.
[276]   *See* Doc. 401 ¶¶ 43–45.

PPE "reduces" exposure.[277] But this incidental effect does not settle the matter. By the same token, if Precision Drilling had a mask mandate, a surgical mask would also reduce exposure. Now in fairness, this is a closer call; the fire retardant coveralls hold up much better than a cloth mask. But as one might expect from coveralls designed to resist fire, when Employees are inundated with drilling fluid, the coveralls have soaked through.[278] Indeed, because of this incomplete protection, Precision Drilling requires that its employees don additional PPE when mixing drilling chemicals, a time when their exposure could be dangerous.[279]

## IV. CONCLUSION

This Court has spent significant time sifting through the record, which is the product of some 20-odd depositions and multiple years of discovery. Today's conclusion is inescapable: 11 years on—with various other parts of the case having been settled or dismissed—there's even less that remains than meets the eye. To find that the Employees' basic PPE guards against workplace hazards that accompany

---

[277] *Tyger IV.* 832 Fed. Appx. at 110.

[278] Doc. 335-4 at 61:5–62:3 (Deposition Testimony of Jeff McWilliams) ("Q. So the coveralls doesn't protect you as a floorhand from drilling mud, does it? A. Yes, it keeps—it keeps it off your skin on most occasions. Q. Okay. But it can soak through the coverall and get on your skin? A. Yeah, if you—like I said if you get doused yeah. Q. So you've had it on your skin? A. Yes."); Doc. 242-9 at 49:3–11 (Deposition Testimony of Shayne Klepper) ("So the way it works is you work your twelve hours. You might go through two pairs of coveralls. We also provide them throw-away Tyvek suits if you're doing a task that's going to really get you covered in mud . . . ."). This exposure is further evidenced by the rig hands who reported rashes. *See* Doc. 242-28 at 41:21–25 (Deposition Testimony of Brandon Weeden); Doc. 242-19 at 44:17–24 (Deposition Testimony of Robert Goodwyn); Doc. 242-18 at 149:3–11 (Deposition Testimony of Shaun Wadsworth); Doc. 242-27 at 74:12–18 (Deposition Testimony of George Hollabaugh).

[279] *See* Doc. 401 ¶¶ 34–39, 41–45.

their principal activities and transcends ordinary risks would be out of step with courts across the country. The hazards that the Employees have described are either ordinary, hypothetical, or isolated. And the protection that the Employees' steel-toed boots, hard hats, safety glasses, fire retardant coveralls, gloves, and earplugs provide against them can at best be described as so-so. This dooms their donning and doffing and walking and waiting time claims alike.[280]

Precision Drilling's motion for summary judgment is therefore granted. An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[280] *See Tyger IV*, 832 Fed. Appx. at 113, n.9 ("the parties agree that, pursuant to the Department of Labor's 'continuous workday rule,' the post-donning and pre-doffing walking and waiting time is compensable only if donning and doffing is also compensable").